No. 04-798

IN THE SUPREME COURT OF THE STATE OF MONTANA

2007 MT 183

_____

SUNBURST SCHOOL DISTRICT NO. 2, et al.,

        Plaintiffs, Respondents and Cross-Appellants,

    v.

TEXACO, INC., et al.,

        Defendants and Appellants.

_____

APPEAL FROM:   District Court of the Eighth Judicial District,
In and for the County of Cascade, Cause No. CDV 01-179,
The Honorable Thomas M. McKittrick, Presiding Judge.

COUNSEL OF RECORD:

    For Appellants:

        Stanley T. Kaleczyc (argued), Browning, Kaleczyc, Berry & Hoven,
Helena, Montana
Charles Cole (argued), Steptoe & Johnson, LLP, Washington, D.C.
Laurence Janssen and Daniel R. Blakey, Steptoe & Johnson, Los Angeles,
California

    For Respondents:

        Tom L. Lewis (argued), J. David Slovak (argued), and Mark M. Kovacich,
Lewis, Slovak & Kovacich, P.C., Great Falls, Montana

    For Amicus Curiae Montana Petroleum Marketers & Convenience Store
Association, Town Pump, Inc., CHS, Inc., and Rocky Mountain Oil, Inc.:

        Keith Strong and Stephen Bell, Dorsey & Whitney LLP, Great Falls,
Montana

For Amicus Curiae Western Environmental Trade Association:

    Page Dringman, Dringman & Redmon, P.C., Big Timber, Montana

For Amicus Curiae Northern Plains Resource Council, Montana Environmental Information Center and Women's Voices for the Earth:

    Jory C. Ruggiero, Beck, Amsden & Ruggiero, PLLC, Bozeman, Montana
    Jack R. Tuholske, Tuholske Law Office, P.C., Missoula, Montana

For Amicus Curiae Montana Trial Lawyers Association:

    Lawrence A. Anderson, Attorney at Law, Great Falls, Montana
    William A. Rossbach, Attorney at Law, Missoula, Montana

                             _____

                                Argued:   March 8, 2006
                            Submitted:  March 14, 2006
                            Decided:  August 6, 2007

Filed:

_____
                      Clerk

Justice Brian Morris delivered the Opinion of the Court.

¶1     Sunburst School District No. 2 and approximately ninety adjoining private property owners (collectively Sunburst) sued Texaco Inc. (Texaco) for damages caused by the migration of benzene onto their properties from Texaco's neighboring refinery. Texaco appeals from a judgment in the Eighth Judicial District, Cascade County, following a jury trial. We affirm in part, reverse in part, and remand for further proceedings.

¶2     Texaco raises numerous issues, but we need address only the following to resolve this matter:

¶3     1.  Whether an award of restoration damages for an injury to real property may exceed the pre-tort market value of the damaged property.

¶4     2.  Whether the Comprehensive Environmental Cleanup and Responsibility Act (CECRA) preempts a common law action for restoration damages.

¶5     3.  Whether the District Court properly instructed the jury to award monetary damages, pursuant to Article II, Section 3, of the Montana Constitution, for any alleged constitutional tort committed by Texaco.

¶6     4.  Whether the District Court's exclusion of Texaco's expert testimony constituted the proper remedy for Texaco's failure to comply with the court's scheduling order and M. R. Civ. P. 26(b)(4)(A)(i).

¶7     5.  Whether the District Court properly excluded evidence of Texaco's negotiations with the Department of Environmental Quality regarding remediation measures.

3

¶8 6. Whether Sunburst established that Texaco acted with actual fraud or actual malice as required by § 27-1-221, MCA, to support a punitive damages award.

¶9 7. Whether the private attorney general doctrine supports the District Court's award of Sunburst's attorney's fees.

## FACTUAL AND PROCEDURAL BACKGROUND

¶10 Texaco operated a gasoline refinery just outside the town of Sunburst, Montana, from 1924 until 1961. Gasoline leaked from pipes at the refinery for many years and contaminated the surrounding soil. The gasoline spread to the subsurface groundwater and eventually migrated underneath the town of Sunburst. The contamination came to Texaco's attention as early as 1955 when escaping fumes from the underground plume caused a house in the town of Sunburst to explode. The accident prompted Texaco to conduct a partial cleanup of the contamination in the soil and groundwater. Texaco extracted some gasoline over the next few years, but left a significant amount of pollution.

¶11 Texaco notified the Environmental Protection Agency (EPA) in 1981 that potentially hazardous substances still might be present at the refinery site. EPA contractors conducted a site investigation in 1985 that revealed contamination of the soils and surface water in and around the refinery. Montana's Department of Environmental Quality (DEQ) eventually assumed jurisdiction over the site pursuant to the terms of the CECRA, §§ 75-10-705 through 728, MCA. The continued presence of pollution caused Texaco to enter into a Consent Order with DEQ in 1989. The Consent Order required

4

Texaco to investigate the pollution in order to develop and implement a remediation plan pursuant to CECRA.

¶12   Texaco completed a study of the groundwater beneath the town of Sunburst in 1991. The study revealed that the groundwater remained contaminated with benzene, a well-known carcinogen. The contamination did not violate any existing standards as Montana had not yet adopted benzene regulations for groundwater. Texaco hired TRC Environmental Consultants, Inc. (TRC) to conduct tests of the benzene levels in homes above the contamination plume. TRC's test results indicated that "no volatile organic vapors were detected in excess of the Montana Department of Environmental Quality (MDEQ) action levels and no further action was required by MDEQ." MDEQ concluded in January 1994—based on the 1991 study by TRC—that "no exposure pathway and therefore no significant risk to the residents existed at the site for the impacted groundwater and no further groundwater investigations or remedial action was warranted."

¶13   DEQ promulgated new regulations for groundwater in 1995. *See* Admin. R. M. 17.30.1003. DEQ based the groundwater regulation for benzene on an excess lifetime cancer risk level, assuming continuous lifetime exposure, not to exceed one in one-hundred thousand. DEQ adopted a value for benzene of 0.005 mg/l, the same number used by the U.S. Environmental Protection Agency.

¶14   Data from the tests conducted by TRC in 1990 as part of the remedial investigation indicated that the groundwater from at least one sampling well in the town of Sunburst exceeded the new DEQ regulation for benzene. A resampling of the well in

1998 demonstrated that the groundwater continued to have benzene levels in excess of the DEQ regulations, thereby causing Texaco to be in violation of CECRA. *See* Admin. R. M. 17.38.204. Texaco sought a waiver from DEQ with regard to the new groundwater regulation. DEQ denied Texaco's waiver request.

¶15 Texaco conducted no further remediation activities until 1999 when it entered into an investigative work plan with DEQ to examine the groundwater conditions. Texaco hired an environmental contractor, Tri-Hydro, Inc. (Tri-Hydro), to investigate the groundwater and to evaluate remediation alternatives. Following the completion of Tri-Hydro's investigation, Texaco proposed to DEQ in May 2003 that it remediate the groundwater contamination through monitored natural attenuation (MNA).

¶16 MNA involves simply monitoring the level of benzene in the groundwater with the expectation that the environment naturally will degrade the benzene over a period of years. Opinions on the degradation period for benzene through MNA ranged from 20 to 100 years to reach contamination levels below the maximum level allowed by the DEQ regulations. Texaco selected MNA as its proposed remediation method based, in part, upon its cost effectiveness. Tri-Hydro estimated that MNA would cost approximately $1 million compared with active remediation plans identified by Tri-Hydro that potentially could cost over $30 million. In 2003, DEQ proposed, for public comment, that Texaco use MNA to conduct the remediation.

¶17 DEQ released information to the public regarding contamination levels in both June 2001 and May 2003. Texaco also presented information to the public concerning the contamination and its proposed remediation method. Texaco's presentation included

6

a map that it had constructed of the contamination plume. At trial, Sunburst alleged that Texaco's map selectively ignored unfavorable data.

¶18 Texaco distributed a newsletter to Sunburst residents in 2001, touting the effectiveness of MNA. The newsletter claimed that benzene levels already had declined dramatically as a result of natural degradation. The newsletter contained a graph that purported to show the benzene levels of the highly-polluted well, identified by the earlier TRC studies, as decreasing over time. Sunburst alleged at trial that Texaco had omitted important data from the graph, however, and substituted data from a separate, less contaminated well, to create the false impression that the benzene level in the groundwater had been declining.

¶19 Sunburst filed this action against Texaco on February 22, 2001. Sunburst alleged numerous causes of action, including trespass, strict liability for abnormally dangerous activity, public nuisance, violation of the constitutional right to a clean and healthful environment, wrongful occupation of property, and constructive fraud. The District Court held a scheduling conference in October of 2003. The court's subsequent scheduling order required the parties to disclose their expert witnesses and any "information required by Rule 26(b)(4)(A)(i), M. R. Civ. P." on March 26, 2004. The parties later stipulated to extend the deadline for expert disclosure to May 11, 2004.

¶20 Texaco listed sixty-seven expert witnesses and referenced documents that were not attached to its disclosure. The disclosure instead referred to documents that were contained in 50,000 pages of files that Texaco had provided in discovery. Sunburst moved to strike Texaco's expert witnesses based upon Texaco's failure to comply with

7

M. R. Civ. P. 26(b)(4)(A)(i). Sunburst alleged that Texaco intended to overwhelm Sunburst's counsel by failing to provide qualifications for many of the sixty-seven listed experts and by failing to specify the facts and opinions upon which many of the experts would testify.

¶21 Texaco argued that Rule 26(b)(4), did not require it to submit expert witness reports for experts who were not retained specifically for litigation. Several of Texaco's proposed experts were Tri-Hydro employees. Texaco originally had retained Tri-Hydro to conduct an investigation at the site pursuant to the terms of the Consent Order that Texaco had entered with DEQ. The District Court deferred until trial any ruling on Sunburst's motion.

¶22 Sunburst also filed a motion *in limine* to prevent Texaco from introducing evidence of DEQ's role in the remediation process at the site. Sunburst contended that evidence of DEQ's role would serve only to confuse the jury because CECRA constrained DEQ's role to enforcing the health-based standards contained in the statute and imposed considerations on DEQ regarding the cost effectiveness of a cleanup plan. The court again deferred ruling until trial.

¶23 The District Court held a three-week jury trial from July 26, 2004, to August 18, 2004. On July 30th, just before opening statements, the court granted Sunburst's motion to exclude any evidence of DEQ's role in the remediation process. The court also sustained Sunburst's objections to the testimony of several of Texaco's expert witnesses on the grounds that Texaco had not adequately disclosed the basis for these witnesses' expert opinions. At the conclusion of the evidence, the court found Texaco to be strictly

8

liable to Sunburst, as a matter of law, for conducting an abnormally dangerous activity. The court found that Texaco's liability for trespass extended to all the Sunburst plaintiffs who owned property above the contamination plume. As a result, the court instructed the jury to determine the amount of damages to award to all of the Sunburst plaintiffs who owned property above the plume, including the reasonable costs of environmental investigation, the cost of any future environmental investigation, and damages for the loss of use and enjoyment of Sunburst's properties. The court also instructed the jury to award all costs that reasonably would be necessary to restore the plaintiffs' property to the condition it would have been absent Texaco's contamination. Finally, the court instructed the jury to award damages if Texaco had violated Sunburst's constitutional right to a clean and healthful environment.

¶24 The jury awarded Sunburst compensatory damages of approximately $16 million. The jury's special verdict included awards of $170,000 for wrongful occupation of property, $371,000 for constructive fraud, $350,000 for the costs of environmental investigation, and a single award of $226,500 for private nuisance, public nuisance and constitutional tort. The jury specified the amount awarded to each individual plaintiff for wrongful occupation and constructive fraud, but combined the award for private nuisance, public nuisance, and constitutional tort.

¶25 Sunburst requested a lump sum award for restoration because they argued cleanup represented a single expense that could not be apportioned among the plaintiffs. Sunburst maintained that they actually intended to use any award of restoration costs to remediate the property, rather than to divide any award among the plaintiffs. The jury awarded a

9

lump sum of $15 million for restoration damages.

¶26 The jury also found Texaco had acted with actual fraud or actual malice and therefore was liable for punitive damages. Following the jury's verdict, the District Court held a separate hearing to calculate the amount of punitive damages to be awarded. Texaco submitted a proposed jury instruction for the punitive damages phase that directed the jury to consider whether its actions comported with state regulations or had been approved by a state regulator. The court denied the instruction, reasoning that it was "the same issue" that the court earlier had decided regarding the admissibility of evidence concerning DEQ. The jury awarded Sunburst $25 million in punitive damages.

¶27 Sunburst filed a post-trial motion for attorney's fees and costs based upon the fact that the plaintiffs had acted as private attorneys general in vindicating an important constitutional right. The District Court determined that Sunburst could recover attorney's fees, but did not settle on an amount. This appeal followed.

## DISCUSSION

### (1) Restoration Damages

¶28 The District Court instructed the jury to award all costs that reasonably would be necessary to restore the plaintiffs' properties to the condition they would have been absent Texaco's contamination. Whether restoration damages may be awarded in excess of a property's market value constitutes a question of law. We conduct a plenary review of a district court's conclusions of law to determine whether the court's conclusions are correct. *In re Conservatorship of Kloss*, 2005 MT 39, ¶ 7, 326 Mont. 117, ¶ 7, 109 P.3d 205, ¶ 7.

10

¶29 Texaco cites *Spackman v. Ralph M. Parsons Co.*, 147 Mont. 500, 414 P.2d 918 (1966), to support its claim that restoration damages never can exceed a property's market value. Texaco fails to note, however, that *Spackman* dealt with readily replaceable items of personal property with an established market value. *Bos v. Dolajak*, 167 Mont. 1, 8, 534 P.2d 1258, 1261 (1975). In *Bos*, the Court rejected the defendant's claim that damages should be limited to the price that the plaintiff had paid for a used silo plus the salvage value of the used silo after being damaged in a windstorm. The Court upheld the jury's verdict that included a damage award of the replacement cost of the silo in order to satisfy the "basic objective of making the injured party whole." *Bos*, 167 Mont. at 6, 534 P.2d at 1260. In *Chandler v. Madsen*, 197 Mont. 234, 242, 642 P.2d 1028, 1033 (1982), we rejected the notion from *Spackman* that a property's market value constitutes "a hard-and-fast rule" for determining the proper amount of damages. There we upheld a jury's award for the costs of repairing a house damaged by subsidence that exceeded the market value of the property. *Chandler*, 197 Mont. at 243-44, 642 P.2d at 1033-34.

¶30 As a result, we look first to the guidelines for the calculation of damages in cases involving injuries to real property in *Burk Ranches, Inc. v. State*, 242 Mont. 300, 790 P.2d 443 (1990). The difference between the value of the property before and after the injury, or the diminution in value, generally constitutes the appropriate measure of damages. We recognized, however, that "no single measure of damages can serve in every case to adequately compensate an injured party. . . ." *Burk Ranches*, 242 Mont. at 305, 790 P.2d at 445-46.

11

¶31 Restoration costs may be awarded if an injury is temporary. *Burk Ranches*, 242 Mont. at 307, 790 P.2d at 447. A temporary injury may be abated or discontinued at any time, either by the act of the wrongdoer, or by the injured party. *Burk Ranches*, 242 Mont. at 306, 790 P.2d at 447. The ability to repair an injury must be more than a theoretical possibility in order for an injury to be temporary. *Burk Ranches*, 242 Mont. at 306, 790 P.2d at 447. A presumption exists that when restoration costs exceed the market value of a property, the injuries are considered permanent and the diminution in value rule applies. *Burk Ranches*, 242 Mont. at 307, 790 P.2d at 447. The presumption of permanence can be overcome, however, "by statutory and common laws, such as environmental laws, which compel repair or replacement." *Burk Ranches*, 242 Mont. at 307, n. 3, 790 P.2d at 447, n. 3. Sunburst contends that the common law compels an award of restoration damages and urges us to adopt the Restatement (Second) of Torts § 929 for the calculation of damages for injuries to real property. Texaco argues that the District Court improperly directed the jury to award restoration damages in a manner that resulted in a jury award in excess of the total market value of Sunburst's combined properties.

Reasons Personal Exception to Diminution in Market Value

¶32 The law of torts "attempts primarily to put an injured person in a position as nearly as possible equivalent to his position prior to the tort." Restatement (Second) of Torts § 901 cmt. a (1997); *Butler v. Germann*, 251 Mont. 107, 110, 822 P.2d 1067, 1069 (1991). Section 929 cmt. b provides that restoration damages may be appropriate in cases where "a building, such as a homestead is used for a purpose personal to the owner . . . ." The

12

Restatement explains that restoration damages may be recoverable "even though this might be greater than the entire value of the building." Restatement (Second) of Torts, § 929 cmt. b. The flexible guidelines of the Restatement (Second) of Torts, § 929, and comment b, allow a district court to craft an appropriate remedy for an injury to real property that restores a plaintiff as nearly as possible to the "state the party would have attained had the [wrong] not occurred." *Butler*, 251 Mont. at 110, 822 P.2d at 1069.

¶33 Restoration awards may compensate a plaintiff more effectively than diminution in value under certain circumstances. For example, when the damaged property serves as a private residence and the plaintiff has an interest in having the property restored, diminution in value will not return the plaintiff to the same position as before the tort. *See Weld County Bd. of County Com'rs v. Slovek*, 723 P.2d 1309, 1314 (Colo. 1986); *see also Fowler Trust v. City of Boulder*, 17 P.3d 797, 805 (Colo. 2001). In *Slovek*, a flood caused by a neighbor deposited silt and debris over a large portion of the plaintiff's land and damaged a fishing pond and a dike on the property. *Slovek*, 723 P.2d at 1311. The plaintiff requested an award to cover the costs to repair the damages to the land and restore the pond. The court relied upon § 929 in approving an award of restoration damages. *Slovek*, 723 P.2d at 1314-15. The court recognized that "the goal in compensating the property owner is to reimburse that owner for the actual loss suffered." *Slovek*, 723 P.2d at 1314.

¶34 If a plaintiff wants to use the damaged property, instead of selling it, restoration of the property constitutes the only remedy that affords a plaintiff full compensation. *Roman Catholic Church v. Louisiana Gas*, 618 So.2d 874, 877 (La. 1993). In *Roman*

13

*Catholic Church,* the Archdiocese of New Orleans (Archdiocese) purchased a low-income housing complex without a public bid from the Department of Housing and Urban Development (HUD) for $1.7 million in order to provide housing for poor families affiliated with its church. *Roman Catholic Church*, 618 So.2d at 875. As a condition of the Archdiocese's purchase, HUD required the Archdiocese to maintain the complex for low-income rentals or the property would revert back to HUD. *Roman Catholic Church*, 618 So.2d at 875. A gas leak caused a fire that damaged the complex. *Roman Catholic Church*, 618 So.2d at 875.

¶35 The Archdiocese brought an action for damages against the supplier of natural gas to the complex. *Roman Catholic Church*, 618 So.2d at 875. The gas supplier admitted liability, but argued that damages should be limited to the diminution in value of the property. *Roman Catholic Church*, 618 So.2d at 875-76. The Louisiana Supreme Court recognized that limiting repair costs to diminution in value would force an innocent landowner either to sell property he wanted to keep or to make repairs out of his own pocket. *Roman Catholic Church*, 618 So.2d at 877. The court concluded that restoration damages were appropriate pursuant to § 929 because the Archdiocese had reasons personal—to provide housing for its low income parishioners—to support restoration. *Roman Catholic Church*, 618 So.2d at 880. The court explained that when considering an award of damages "it is important to know how the property is used and what interest in it is asserted, so that the measure can be adopted that will afford compensation for any legitimate use that the owner makes of his property." *Roman Catholic Church*, 618 So.2d at 880; *see also Rector, etc. v. C. S. McCrossan*, 235 N.W.2d 609 (Minn. 1975)

14

(holding that replacement costs should be considered when the owner has reasons personal for the restoration).

¶36   We have adopted other sections of the Restatement (Second) of Torts. *See, e.g.*, *Crisafulli v. Bass*, 2001 MT 316, ¶ 23, 308 Mont. 40, ¶ 23, 38 P.3d 842, ¶ 23 (adopting § 316, which imposes liability on a parent for the acts of a child in limited circumstances); *Brandenburger v. Toyota Motor Sales, U.S.A. Inc*., 162 Mont. 506, 513 P.2d 268 (1973), (adopting the language of § 402A imposing strict liability on the seller of defective products); *First Bank (N.A.)—Billings v. Clark*, 236 Mont. 195, 206, 771 P.2d 84, 91 (1989) (adopting § 46, comment j, relating to the tort of emotional distress).   We now join other jurisdictions in adopting the flexible guidelines of the Restatement (Second) of Torts § 929, and comment b, for the calculation of damages to real property to ensure that plaintiffs receive a proper remedy for their injuries.

¶37   It is clear that the market value of land will not always correspond directly to a plaintiff's damages resulting from an injury to real property, thus rendering diminution in market value an inadequate measure of the property's worth to the owner.   Other courts have acknowledged that "the loss in market value is a poor gauge of damage" when the property gains its principal value from personal use rather than for pecuniary gain. *Matich v. Gerdes*, 550 N.E.2d 622, 626 (Ill. App. 4 Dist. 1990).   Similarly, a nonprofit, charitable, or religious organization may place a high value on a particular parcel of real property that the market might not reflect. *Roman Catholic Church*, 618 So.2d at 879-80; *Trinity Church v. John Hancock Mut. Life Ins. Co*., 502 N.E.2d 532, 535-36 (Mass. 1987).   Our adoption of § 929, and comment b, reflects the need for a flexible measure of

damages to compensate adequately an injured property owner.

¶38   We agree with Sunburst that an award of restoration damages must be available to compensate a plaintiff fully for damages to real property when diminution in value fails to provide an adequate remedy. *See, e.g., Anderson v. Bauer*, 681 P.2d 1316 (Wyo. 1984) (recognizing restoration damages under the reasons personal exception to § 929). Sunburst has demonstrated in this case that the diminution in market value approach fails to provide adequate compensation. Sunburst brought an action for contamination of the plaintiffs' personal residences with benzene, a well-known carcinogen. A personal residence represents the type of property in which the owner possesses a personal reason for repair. Restatement (Second) of Torts § 929. The court in *Slovek*, 723 P.2d at 1314, recognized that the personal reasons for repair are usually the owner's desire to enjoy and live in their homes. These reasons prove compelling and we adopt them as part of our analysis under Montana law.

¶39   One plaintiff, Sunburst School District, owns property that does not constitute a personal residence. The Sunburst School District operates a public school on the property. We still deem an award of restoration damages to be appropriate, however, in light of the fact that the responsible party could not remediate the groundwater beneath the personal residences owned by the other plaintiffs without also treating the groundwater beneath the school. The presence of the district as a collateral beneficiary does not defeat an award of restoration damages. *Cf. Roman Catholic Church*, 618 So.2d at 880 (church deemed to be appropriate beneficiary of restoration damages).

16

<u>Concern Over Unreasonable Windfall</u>

¶40 Texaco argues that any award of restoration damages that exceeds the market value of real property would result in a windfall for Sunburst as nothing requires the plaintiffs to use these funds to repair their properties. An "injured party is to be made as nearly whole as possible—but not to realize a profit. Compensatory damages are designed to compensate the injured party for actual loss or injury—no more, no less." *Burk Ranches*, 242 Mont. at 307.

¶41 In *Orndorff v. Christiana Community Builders*, 217 Cal. App. 3d 683, 266 Cal. Rptr. 193 (Cal. App. 4th Dist. 1990), the evidence indicated that the costs of repairing a house constructed on uncompacted fill material likely exceeded the post-restoration value of the property. The court nevertheless accepted the uncontradicted testimony of the homeowners that they intended to repair their property. *Orndorff*, 217 Cal. App. 3d at 689, 266 Cal. Rptr. at 196. The owners had lived in the house for eleven years and testified that they had no intention of moving. *Orndorff*, 217 Cal. App. 3d at 689, 266 Cal. Rptr. at 196. The court determined that the injured property owners were not required to make any further showing to obtain their reasonable repair costs. *Orndorff*, 217 Cal. App. 3d at 689, 266 Cal. Rptr. at 196; *see also Keitges v. VanDermeulen*, 483 N.W.2d 137 (Neb. 1992) (holding that evidence of an owner's intent was relevant to an award of restoration damages).

¶42 Similarly, in *Heninger v. Dunn*, 101 Cal. App. 3d 858, 162 Cal. Rptr. 104 (1980), the court upheld an award of restoration damages even though the wrongful act of bulldozing a road and destroying a tree actually had increased the fair market value of the

17

property.  The court relied on the owner's testimony that "the land is beautiful" and he would "like to see it remain that way."  *Heninger*, 101 Cal. App. 3d at 866, 162 Cal. Rptr. at 109.  The court deemed these statements sufficient evidence of reasons personal to support the award.  *Heninger*, 101 Cal. App. 3d at 866, 162 Cal. Rptr. at 109.  The court in *Denoyer v. Lamb*, 490 N.E.2d 615, 618 (Ohio App. 1984), agreed: "[W]hen the owner intends to use the property for a residence or for recreation or for both, according to his personal tastes and wishes, the owner is not limited to diminution in value . . . ."  *Cf. Braun v. Agri-Systems*, 2006 U.S. Dist. LEXIS 29947 (E.D. Cal. May 16, 2006) (rejecting that the cost of repairs was the appropriate measure of damages due to the fact that the owner already had sold the damaged property and could not make repairs).

¶43    We agree with these courts that evidence that an award of restoration damages actually will be used to repair the damaged property could overcome the general rule in favor of diminution in value as the appropriate measure of damages.  The record in this case indicates that Sunburst actually will use the award of restoration damages to remediate the groundwater contamination.  For example, the special verdict form presented to the jury provided for a single lump sum to be awarded for restoration damages.  In presenting the special verdict form, Sunburst explained that a lump sum restoration award "attacks the problem as a whole, and the cleanup is a single expense, and damages cannot be divided between the plaintiffs . . . ."

¶44    Plaintiff Larry Linnell, when asked what he wanted accomplished in this lawsuit, testified that the "first and foremost thing that I want to see done is that the area gets cleaned up . . . ."  Plaintiff Bradley Haugen testified that he joined the lawsuit against

18

Texaco in order to "leave Sunburst in a much better position than it is now so that other people can live there without danger or worry." Texaco did not refute these claims on cross-examination and did not present any evidence or testimony of its own to contradict Sunburst's testimony. In light of the special verdict form, Sunburst's arguments in support of the form, and the uncontroverted testimony that Sunburst presented that they will use the restoration damages award for remediation, we determine that the award of restoration damages in this case would not constitute an unreasonable windfall.

### Reasonableness of Amount of Restoration Damages

¶45 Finally we assess the reasonableness of the jury's award of $15 million in restoration damages compared to the value of the damaged property. As a general rule, courts have assessed the reasonableness of an award of restoration damages against the market value of the property before the damage. *See, e.g., Dixon v. City of Phoenix*, 845 P.2d 1107, 1117 (Ariz. App. Div. 1 1992) (holding that restoration damages must be reasonable in relation to the "damage inflicted"); *Slovek*, 723 P.2d at 1317 (holding that the cost of restoration must not be "wholly unreasonable" in relation to the pre-tort market value). Strictly capping the amount of restoration costs available to the pre-tort market value of the property, however, raises serious public policy concerns.

¶46 A strict cap on restoration damages would equip the tortfeasor with the equivalent of a private right of inverse condemnation, or a power akin to a private right of eminent domain. Eminent domain is the right of the State to take private property for public use. Section 70-30-101, MCA. A potential tortfeasor would have an incentive to disregard or discount risks of contamination or pollution to neighboring property owners. Instead, a

potential tortfeasor, armed with a power akin to a private right of eminent domain, could undertake any dangerous activity content with the knowledge that the damages from any harm that it may cause to a neighboring property, regardless of the cost of remediating the harm, would be limited to the market value of the neighboring property.

¶47    Injured property owners, by contrast, would face a "take it or leave it" proposition: sell the homes that they do not want to leave or continue to live under an increased threat of exposure to toxic chemicals.  Injured property owners in Montana should not be forced into such a Hobson's choice.   Private individuals and corporations have no inherent power to exercise eminent domain and their authority to condemn must derive from legislative grant.  *McCabe Pet. Corp. v. Ease. and Right-of-Way*, 2004 MT 73, ¶ 8, 320 Mont. 384, ¶ 8, 87 P.3d 479, ¶ 8.  The legislature has not granted this power to private tortfeasors in Montana and we decline to create it.  *See* § 70-30-102, MCA (enumerating public uses).

¶48    A strict cap on restoration damages also would fail to provide an adequate remedy for an injury to the environment or a special purpose property.   Areas with great ecological value may have little or no commercial value.  A strict cap on restoration damages would deny any meaningful remedy for the harm to such areas.  The court in *Com. of Puerto Rico v. SS Zoe Colocotroni*, 628 F.2d 652, 673 (1st Cir. 1980), acknowledged this concern in refusing to limit restoration damages to diminution in value where an oil spill affected an environmentally-sensitive area with an alleged market value of $5,000 per acre.  *See also Nampa & Meridian Irr. Dist. v. Mussell*, 72 P.3d 868 (Idaho 2003) (recognizing that the cost of repairing or restoring an irrigation ditch was an

20

appropriate measure of damages as the easement had no value other than as a water conveyance). The court in *SS Zoe Coloctroni* recognized that a strict application of the diminution in value rule "would frustrate appropriate measures to restore or rehabilitate the environment." *SS Zoe Coloctroni*, 628 F.2d at 673. Although the court there relied on a statute that allowed for the awarding of restoration damages, its rationale is relevant here.

¶49 The jury awarded Sunburst $15 million in restoration damages. Testimony at trial established that the properties located above the contamination plume have an aggregate market value of approximately $2 million. A strict cap on restoration damages applied to the Sunburst property barely would cover the cost of MNA, Texaco's preferred remediation method, estimated at approximately $1 million. The costs of the active remediation plans identified by Texaco's consultants could approach $30 million. The jury's award of $15 million in restoration damages falls comfortably within these two extremes, and we deem it to be reasonable compensation. For these reasons and under these circumstances, we conclude that the District Court properly allowed the jury to make an award of restoration damages to Sunburst that exceeded the value of the damaged property.

<u>(2) Preemption of Restoration Damages</u>

¶50 Texaco next argues that CECRA preempts a common law action of the type pursued by Sunburst for trespass or wrongful occupation of property that seeks restoration damages. Texaco contends that an award of restoration damages would interfere with CECRA's delegation to DEQ to determine the standard for cleanup and to

determine any plan for remediation. *See* § 75-10-721, MCA. In this case, DEQ proposed, for public comment, MNA as an appropriate remediation method. Thus, Texaco maintains that Sunburst's common law action would usurp DEQ's authority by requiring a more active remediation plan.

¶51 We long have recognized common law actions for intentional trespass, *Branstetter v. Beaumont Supper Club, Inc.*, 224 Mont. 20, 24, 727 P.2d 933, 935 (1986) (adopting the Restatement (Second) of Torts § 158's definition of intentional trespass), and negligent trespass, *Guenther v. Finley*, 236 Mont. 422, 425, 769 P.2d 717, 719 (1989) (discussing the tort of reckless or negligent trespass and applying the Restatement (Second) of Torts § 165). We must address whether CECRA preempts an award of restoration damages for these actions. The common law applies in Montana whenever it does not conflict with a statute. *See* § 1-1-108, MCA; *O'Fallon v. Farmers Ins. Exchange*, 260 Mont. 233, 244, 859 P.2d 1008, 1015 (1993). A presumption exists against statutory preemption of common law claims. *See Pritchard Petroleum Co. v. Farmers Co-Op. Oil & Sup. Co.*, 121 Mont. 1, 15, 190 P.2d 55, 63 (1948). A statute does not take away common law claims except to the extent that the statute expressly or by necessary implication declares. *Pritchard Petroleum,* 121 Mont. at 15, 190 P.2d at 63.

¶52 We addressed the issue of statutory preemption of common law claims in *Brewington v. Employers Life Ins. Co.*, 1999 MT 312, 297 Mont. 243, 992 P.2d 237. In *Brewington*, the personal representative of a deceased worker's estate brought a common law bad faith claim against the employer's workers' compensation insurer. *Brewington*, ¶¶ 6-8. The district court dismissed the claim on the grounds that the Unfair Trade

22

Practices Act, specifically § 33-18-242, MCA, preempted the common law action. *Brewington*, ¶ 10. We limited statutory preemption of common law claims to those circumstances in which a direct conflict exists between the statute and the common law claim. *Brewington*, ¶¶ 14-19. Although § 33-18-242(3), MCA, sought to provide the sole remedy for breach of contract claims and for fraud claims, we noted that the statute referred exclusively to claims brought by an "insured" and made no mention of third-party claimants. *Brewington*, ¶ 14. We declined to expand the scope of § 33-18-242(3), MCA, to prohibit breach of contract claims by third-party claimants. *Brewington*, ¶ 14.

¶53 In this case, CECRA does not explicitly prohibit common law claims. Although CECRA provides for a private right of action, § 75-10-724, MCA, this provision differs markedly from the common law action for restoration damages that Sunburst pursued. CECRA's private right of action focuses on a potentially responsible party bringing an action for contribution or declaratory relief against other potentially liable parties for the recovery of remediation costs. In fact, the legislature directed DEQ to "set up a collaborative process" to analyze the elimination of joint and several liability with respect to cleanup of CECRA-covered facilities. 1995 Mont. Laws 3419. This collaborative process culminated in the legislature's amendment of § 75-10-724, MCA, in 1997 to make available the contribution and declaratory relief actions for potentially liable parties. 1997 Mont. Laws 1930.

¶54 The private right of action provision contains no limitation on common law claims seeking remediation damages. Neither the private right of action contained in § 75-10-724, MCA, as originally enacted, nor the 1997 amendment, makes any mention of

23

excluding any potential common law claims. We will not add to CECRA a prohibition against common law claims that seek to recover restoration damages where the legislature has declined to do so. *Brewington*, ¶ 14.

¶55 Texaco asserted at oral argument that CECRA also preempts common law claims by necessary implication in that Sunburst could have brought a private right of action pursuant to CECRA's "voluntary cleanup" provision set forth in §§ 75-10-730 through 738, MCA. Under this provision, Sunburst would have been required to fund an extensive environmental assessment and propose a detailed voluntary cleanup plan that had been prepared by a qualified environmental professional. Sections 75-10-733(1), 734, MCA. Sunburst further would have been required to reimburse DEQ for any remedial action costs that DEQ incurred in the review and oversight of the proposed voluntary cleanup plan. Section 75-10-733(3), MCA.

¶56 Sunburst would have been required to undertake these expenses with no guarantee that DEQ would approve the proposed voluntary cleanup plan, and with no guarantee that DEQ would require Texaco to cover the cost of the voluntary cleanup plan. Section 75-10-736, MCA. Although Texaco itself spent millions of dollars and went through at least two private contractors before arriving at its preferred alternative of MNA, with its $1 million price tag, Texaco downplays the risk to Sunburst of having to cover these costs. Moreover, Texaco fails to explain by what authority DEQ would impose this extra burden on Texaco when Sunburst's proposed voluntary cleanup plan likely would include remediation activities that would seek to reduce the contamination levels below CECRA's health-based standards. As noted by Sunburst, CECRA's health-based

24

standards do not necessarily equate to the complete absence of any health risks. Section 75-5-301, MCA.

¶57 Finally, pursuant to § 75-10-733(2)(c), MCA, Sunburst would have been required to obtain Texaco's written consent to implement the proposed voluntary cleanup plan. Texaco engaged in protracted negotiations with DEQ from the time that the parties first entered into a Consent Decree in 1989 through DEQ's authorization of MNA in 2003. The prospect of Texaco consenting to a more active remediation plan seems implausible in this context.

¶58 More importantly, § 75-10-732, MCA, provides the eligibility criteria for a voluntary cleanup of a CECRA-covered facility, such as Texaco's refinery. The legislature amended this section in 1997. According to the amendment's statement of intent, the legislature sought "to provide potentially liable persons the opportunity to take the necessary remedial action *before* the state takes action . . . ." 1997 Mont. Laws 3210 (emphasis added). In other words, the legislature intended that the statute would allow a potentially liable party the opportunity to act before the State compelled remediation. The legislature made no mention of its intent that an injured property owner would use this statute as a vehicle to compel more active remediation. We reject the notion that the legislature could have intended this statute to provide a vehicle for an injured property owner to pursue a more active remediation program. *See* § 1-2-102, MCA (the intention of the legislature is to be pursued in interpreting a statute).

¶59 Thus, we agree with Sunburst that CECRA's focus on cost effectiveness and limits on health-based standards differ from the factors to be considered in assessing damages

25

under the common law. Nothing in CECRA preempts a common law claim that seeks to recover restoration damages to remediate contamination beyond the statute's health-based standards. We conclude that no conflict exists between DEQ's supervisory role under CECRA and restoration damages awarded under the common law. We further conclude that nothing in CECRA precludes a common law claim by necessary implication.

### (3) Constitutional Tort

¶60 Texaco challenges the District Court's decision to instruct the jury to award monetary damages, pursuant to Article II, Section 3, of the Montana Constitution, for any alleged constitutional tort. The availability of a cause of action presents a question of law that we review to determine if it is correct. *Dorwart v. Caraway*, 2002 MT 240, ¶ 29, 312 Mont. 1, ¶ 29, 58 P.3d 128, ¶ 29.

¶61 The Montana Constitution provides that all persons have a "right to a clean and healthful environment." Art. II, Sect. 3, Mont. Const. The right to a clean and healthful environment constitutes a fundamental right. *MEIC v. Dept. of Environmental Quality*, 1999 MT 248, ¶ 63, 296 Mont. 207, ¶ 63, 988 P.2d 1236, ¶ 63. Texaco argues, however, that Article II, Section 3, cannot support a private cause of action for monetary damages as it is not "self-executing." As a result, Texaco contends that "the Montana Constitution places responsibility for environmental remedies squarely in the hands of the Legislature." Texaco asserts that CECRA serves as the Legislature's adopted remedy for environmental violations.

26

¶62 Sunburst points to our decision in *Dorwart,* ¶ 43, to support its claim that a private party must be able to bring an action seeking monetary damages against another private party for a violation in order to vindicate a fundamental constitutional right. The parties fully briefed this question and presented oral argument to the Court. In fact, we expressly framed the issues to be presented at oral argument to include whether "the right to a clean and healthful environment, Article II, Section 3, Constitution of Montana, is self-executing?" This Court repeatedly has recognized, however, that courts should avoid constitutional issues whenever possible. *The Trust v. Yellowstone County*, 2002 MT 201, ¶ 24, 311 Mont. 194, ¶ 24, 53 P.3d 1268, ¶ 24. We deem it possible in light of our decision in *Dorwart* to resolve this case without resort to determining whether Article II, Section 3, is self-executing and consequently could support a private cause of action for monetary damages.

¶63 The plaintiff in *Dorwart* brought an action against Stillwater County and several police officers stemming from an alleged illegal search and seizure. The plaintiff sought monetary damages based on alleged common law violations and alleged violations of Article II, Sections 10, 11, and 17 of the Montana Constitution. *Dorwart*, ¶ 16. We recognized that common law causes of action intended to regulate relationships among and between individuals may not always be adequate to redress the type of damage caused by the invasion of constitutional rights by government actors. *Dorwart*, ¶ 46. We noted that a police officer's actions are likely to be more harmful than those resulting from the conduct of a private citizen. *Dorwart*, ¶ 43. We further reasoned that Article II, Section 16 of the Montana Constitution afforded speedy remedy for every injury of

27

person, property, or character. *Dorwart*, ¶ 45. As a result, we held that recognition of a constitutional tort was necessary to provide citizens with an adequate remedy due to the fact that an injury inflicted by a government agent differs from the injury inflicted by a private individual. *Dorwart*, ¶ 46.

¶64 Thus we concluded in *Dorwart* that the absence of any other remedy supported the establishment of a constitutional tort. *Dorwart*, ¶ 46. We now have adopted Restatement (Second) of Torts § 929, to allow for the recovery of restoration damages. *See* ¶36, supra. By their very nature, restoration damages would restore a private party back to the position that it occupied before the tort. An award of restoration damages serves to ensure a clean and healthful environment. Sunburst has not demonstrated that the common law restoration damages would not address adequately any potential damages caused by Texaco's contamination. Accordingly, we conclude that the District Court erred in instructing the jury on the constitutional tort theory where, as here, adequate remedies exist under statutory or common law.

¶65 The special verdict form did not apportion the $226,500 award of damages between the constitutional tort and public nuisance, a circumstance that normally might require this Court to grant Texaco's request that we remand the damages award to the District Court. *See e.g., Little v. Grizzly Mfg.*, 195 Mont. 419, 427, 636 P.2d 839, 843 (1981). We note, however, that Texaco advocated that portion of the special verdict form that prevents us from resolving what part of the $226,500 damage award that the jury intended to attribute to the public nuisance claim.

28

¶66     Courts uphold a general verdict where substantial evidence supports any ground of recovery "in the absence of a pertinent objection to the charge or a request for a specific interrogatory." *Union Pacific Railroad Company v. Lumbert*, 401 F.2d 699, 701 (10th Cir. 1968); *see also Davis v. Rennie,* 264 F.3d 86, 106 (1st Cir. 2001); *Kossman v. Northeast Illinois Regional Commuter R.R.*, 211 F.3d 1031 (7th Cir. 2000); *McCord v. Maguire*, 873 F.2d 1271 (9th Cir. 1989).  Texaco asked the District Court to submit a special verdict form to the jury that would have permitted the jury to enter only a single damage figure for all of the damages resulting from the combined claims of nuisance, public nuisance, and the constitutional tort once there was a "finding as to which tort was committed as to which plaintiff."  Texaco sought to combine the damages for all three torts in order to "delete any potential for overlap of damages."  Although the District Court denied Texaco's proposed special verdict form, it submitted a special verdict form to the jury that reflected Texaco's suggestion that the form permit only a single damages figure for the separate torts.

¶67     Texaco's successful appeal of the constitutional tort instruction should not force a new trial on the damages attributable to the public nuisance when Texaco failed to object to—and in fact advocated—the submission of a special verdict form that combined the damages award for the various theories of liability.  *Lumbert*, 401 F.2d at 701.  Moreover, the record demonstrates that substantial evidence at trial established that Texaco allowed gasoline and other substances to leak into the ground thereby creating an underground plume that contaminates the soil and groundwater under Sunburst's properties.  Substantial evidence presented to the jury also showed that the plume

29

contains high levels of carcinogens, that it continues to expand, and that the properties located on the plume suffer ongoing harm from the presence and migration of the underground plume. Substantial evidence supports the jury's $226,500 damage award based on the jury's finding that Texaco created a public nuisance and thus we need not remand the damages award to the District Court. *Lumbert*, 401 F.2d at 701.

### (4) Exclusion of Texaco's Expert Testimony

¶68 Texaco challenges the District Court's exclusion of testimony by its expert witnesses whom it disclosed pursuant to the court's scheduling order. A district court possesses broad discretion in ruling on the admissibility of expert testimony, and without a showing of abuse of discretion, the district court's ruling will not be disturbed on appeal. *State v. Vernes*, 2006 MT 32, ¶ 14, 331 Mont. 129, ¶ 14, 130 P.3d 169, ¶ 14.

¶69 Texaco argues, in particular, that the District Court improperly excluded the expert testimony of three people employed by its environmental consultant, Tri-Hydro. Texaco also argues that the requirements of M. R. Civ. P. 26(b)(4)(A)(i) apply only to interrogatories. We disagree.

¶70 The District Court's scheduling order required the parties to submit their expert witness disclosures in compliance with the requirements of Rule 26(b)(4)(A)(i), negating the need for either party to file interrogatories. Likewise, the spirit of our rules of civil procedure requires liberal disclosure on the part of all parties, including the disclosure of witnesses. *Superior Enterprises v. Montana Power Co.*, 2002 MT 139, ¶ 18, 310 Mont. 198, ¶ 18, 49 P.3d 565, ¶ 18. Neither party filed separate interrogatories. The court did not intend for the parties to file separate interrogatories to demand expert witness

30

disclosures. The court's scheduling order in this case carried the same effect as would a party's interrogatory requesting disclosure. *See Nelson v. Nelson*, 2005 MT 263, ¶¶ 31-34, 329 Mont. 85, ¶¶ 31-34, 122 P.3d 1196, ¶¶ 31-34; *Seal v. Woodrows Pharmacy*, 1999 MT 247, ¶ 23, 296 Mont. 197, ¶ 23, 988 P.2d 1230, ¶ 23.

¶71　Texaco nevertheless maintains that the court's exclusion of its expert witnesses constituted too harsh of a remedy in light of the fact that Sunburst did not suffer any prejudice from Texaco's inadequate disclosures. Texaco claims that Sunburst already had deposed several of the Tri-Hydro witnesses and had ample opportunity to depose all the witnesses listed in its disclosure. Texaco provided a list of sixty-seven expert witnesses on May 12, 2004. Discovery closed on June 15, 2004, and the trial was set for July 26, 2004. Sunburst could not have deposed adequately all sixty-seven of Texaco's listed expert witnesses in that limited time frame.

¶72　Even with respect to the Tri-Hydro employees whom Sunburst already had deposed, however, we cannot say that Sunburst did not suffer any prejudice. Texaco did not notify Sunburst of its intent to have these Tri-Hydro witnesses potentially provide Rule 702 testimony until Texaco disclosed them as experts. This disclosure took place after Sunburst had deposed the Tri-Hydro employees. Without such notice, the opportunity to depose does not remove the prejudice. *Jenkins v. Whittaker Corp.*, 785 F.2d 720, 728, n. 20 (9th Cir. 1986). As noted by the commentary to the similar federal rule, "[t]he lawyer even with the help of his own experts frequently cannot anticipate the particular approach his adversary's expert will take or the data on which he will base his judgment on the stand." Fed. R. Civ. P. 26(b)(4) advisory comm. nn. Sunburst could not

anticipate the particular approach that Texaco's proposed experts would take or the data on which they would rely without a full disclosure provided by Texaco, pursuant to M. R. Civ. P. 26(b)(4)(A)(i), and a reasonable opportunity to depose them after the disclosure. *Jenkins*, 785 F.2d at 728 n. 20.

¶73    We cannot say on these facts that the District Court's decision to prohibit Texaco from introducing expert testimony for its failure to comply with the provision of the scheduling order regarding expert witness disclosures pursuant to M. R. Civ. P. 26(b)(4)(A)(i), rises to the level of an abuse of discretion. *Vernes, ¶* 14. Accordingly, we affirm the District Court's decision to prevent Texaco's expert witnesses from testifying.

### (5) Exclusion of Evidence Related to DEQ for Compensatory Damages

¶74    The District Court excluded from the trial any evidence of Texaco's negotiations with DEQ over remediation alternatives. We review a district court's evidentiary rulings to determine if the court abused its discretion. *Finstad v. W.R. Grace & Co.*, 2000 MT 228, ¶ 43, 301 Mont. 240, ¶ 43, 8 P.3d 778, ¶ 43. A district court has broad discretion to determine the admissibility of evidence. *Finstad*, ¶ 43.

¶75    Texaco argues that DEQ's oversight of the contamination and involvement in the selection of remediation alternatives constituted highly relevant evidence in that it would have demonstrated to the jury that an independent party had monitored Texaco's investigation, had concurred in its MNA remediation plan, and would have provided oversight to ensure that Texaco properly completed the remediation. The evidence that Texaco sought to introduce of DEQ's role has no bearing, however, on Texaco's conduct before federal and state regulators became involved at the Sunburst site.

¶76 Texaco presented offers of proof to the District Court with respect to three current or former DEQ employees—Carol Fox, Aimee Reynolds, and David Bowers. The offers of proof indicated that the excluded DEQ witnesses would have testified exclusively about Texaco's negotiations with DEQ from the late 1980s through the filing of this action by Sunburst in 2003. The exhibits attached to Texaco's offers of proof also reflect correspondence and interactions between Texaco and DEQ during this same period.

¶77 The District Court determined that Texaco was strictly liable for the harm stemming from Texaco's operation of its refinery. Texaco did not appeal this determination. As a result, liability flowed to Texaco despite any attempts by it to minimize the harm or belatedly mitigate the contamination. The common law seeks to restore a party to the condition that existed before the injury. *Burk Ranches*, 242 Mont. at 307, 790 P.2d at 447. No benzene contamination existed in the groundwater before the injury. The contamination originated from Texaco's refinery operations. Texaco ceased operating the refinery in 1961. The benzene had migrated to the groundwater beneath the town of Sunburst by that time as evidenced by the explosion that destroyed a house in 1955. The migration likely had been completed by 1990 when sampling wells operated by Texaco's contractor, TRC, revealed elevated levels of benzene.

¶78 Evidence of Texaco's after-the-fact negotiations with DEQ in the 1990s and the early 2000s to demonstrate its level of cooperation with state regulators after having caused the contamination would not change the scope of the damage or the cost of removing the contamination from the Sunburst property. Neither Texaco's negotiations with DEQ nor its belated attempts to comply with CECRA would alter Texaco's liability

33

stemming from its conducting of an abnormally dangerous activity or the amount of harm suffered by Sunburst. Strict liability applies; accordingly, Texaco would be liable for Sunburst's compensatory damages regardless of the care with which Texaco may or may not have conducted its refinery operations. *Matkovic v. Shell Oil Co.*, 218 Mont. 156, 159, 707 P.2d 2, 4 (1985) (adopting Restatement (Second) of Torts § 519). Texaco would be liable for compensatory damages regardless of the level of Texaco's cooperation with DEQ more than thirty years after having caused the last of the contamination from its refinery. *Matkovic*, 218 Mont. at 159, 707 P.2d at 4.

¶79 Finally, the District Court determined that Texaco had failed to disclose adequately its expert witnesses as required by the court's scheduling order. Texaco admits that this determination prevented it from offering any testimony by its experts at trial. We affirmed the court's determination at ¶ 73, supra. Thus, it is unlikely that Texaco would have been able to solicit any testimony from their DEQ experts regardless of the correctness of the District Court's decision to exclude the DEQ evidence based upon a lack of relevancy to Sunburst's claims for compensatory damages.

¶80 We agree with the District Court that DEQ's role in Texaco's belated attempts to comply with CECRA would not be relevant to Sunburst's claims to be made whole under the common law. We cannot say on this record that the District Court's exclusion of evidence regarding DEQ's role when determining Texaco's liability for various common law claims rose to the level of an abuse of discretion. *Finstad*, ¶ 43.

### (6) Exclusion of Evidence Relating to DEQ for Punitive Damages

¶81 Texaco contends that the District Court's exclusion of evidence of DEQ's role in

the remediation process prevented it from introducing evidence bearing on its state of mind. Punitive damages may be awarded when a defendant has been found to have acted with actual fraud or actual malice. Section 27-1-221, MCA. The defendant's state of mind represents a key element in determining whether a defendant acted with actual fraud or actual malice. A good-faith effort to comply with all government regulations "would be evidence of conduct inconsistent with the mental state requisite for punitive damages." *Silkwood v. Kerr-McGee Corp*., 485 F.Supp. 566, 584 (W.D. Okla. 1979).

¶82 The District Court's order upholding the jury's award of punitive damages included a number of findings of fact regarding misconduct by Texaco. The court noted, among other matters, that Texaco had been communicating with the public regarding the contamination since the late 1980s. The court found that Texaco's communication with the public "consistently [has] minimized the problem and failed to accurately report their findings." The court attributed this effort at minimization to the fact that Texaco was motivated by its "own financial interests." In particular, the court referred to a 1989 document outlining Texaco's "hidden agenda" to save money at the expense of meaningful cleanup in Sunburst. The court further attributed to Texaco "numerous affirmative misrepresentations concerning the pollution in Sunburst." Finally, the court found that Texaco's decision to rely upon MNA as its remediation alternative "was not scientifically supportable."

¶83 We cite these findings, not to dispute their accuracy, but to point out that the District Court relied, at least in part, upon Texaco's conduct, or more appropriately, its misconduct, since entering the Consent Decree with DEQ in 1989, in justifying the jury's

35

award of punitive damages.  Despite partially relying on Texaco's post-Consent Decree conduct in justifying the jury's award of punitive damages, the District Court excluded evidence of Texaco's negotiations with DEQ during this same time frame.  The District Court determined that evidence of Texaco's negotiations with DEQ likely would confuse the jury and divert its attention from evaluation of Sunburst's common law claims.  We agreed that evidence of Texaco's negotiations with DEQ was not relevant to the issue of compensatory damages.  ¶ 80, *supra*.  We cannot agree, however, that this DEQ evidence would not be relevant to the issue of punitive damages.

¶84    A district court retains, and should use, authority under Mont. R. Evid. 403, to keep a trial within sensible bounds.  A district court may not categorically exclude, however, evidence tending to show why the defendant acted as it did, or failed to act, whatever the case may be, when a jury considers whether to award punitive damages. *See, e.g., Swinton v. Potomac Corp.*, 270 F.3d 794, 814-15 (9th Cir. 2001) (holding that trial court retains discretion to allow defendant to introduce evidence of remedial measures in response to its discovery of misconduct as a means to mitigate punitive damages).  Such evidence bears on whether Texaco acted with "deliberate indifference," whether Texaco knowingly concealed any material facts, and the size of any appropriate punitive award.  For example, Texaco may be able to persuade a jury that its choice of MNA as a remediation alternative following negotiations with DEQ did not evince "deliberate indifference" to the rights and health of the property owners in Sunburst.  As noted by the District Court, Sunburst has a strong argument that Texaco's inaction and selection of the relatively cheap MNA remediation alternative indeed demonstrate

36

"deliberate indifference," but the debate should not be preempted by disabling Texaco from explaining itself. *E.E.O.C. v. Indiana Bell Telephone Co.*, 256 F.3d 516, 528 (7th Cir. 2001).

¶85 We conclude that the District Court abused its discretion by prohibiting Texaco from introducing evidence at trial of DEQ's involvement with the site remediation and Texaco's attempted compliance with CECRA for purposes of considering the appropriateness of punitive damages. The District Court compounded this error when it refused to instruct the jury at the hearing on the amount of punitive damages to consider whether Texaco's actions comported with state regulations or had been approved by a state regulator. We vacate the jury's award of $25 million in punitive damages. The question of the appropriateness of punitive damages must be put again to a jury with Texaco being allowed to present evidence of DEQ's role in the process.

¶86 Our decision raises the problem of how the District Court could have prevented the jury from hearing evidence of DEQ's role for purposes of compensatory damages, but allowed the jury to hear evidence of DEQ's role for purposes of determining the appropriateness of punitive damages. We need not resolve this dilemma, however, as the District Court excluded evidence of DEQ's role for both purposes. We affirmed the District Court's exclusion for purposes of compensatory damages. ¶ 80, *supra*. A new jury may consider evidence of DEQ's role for purposes of determining whether Texaco acted with actual fraud or actual malice.

### (7) Attorney's Fees

¶87 Texaco attacks the District Court's award of Sunburst's attorney's fees based on

the private attorney general doctrine. We will not overturn a district court's award of attorney's fees absent an abuse of discretion. *See School Trust v. State ex rel. Bd. Of Com'rs*, 1999 MT 263, ¶ 68, 296 Mont. 402, ¶ 68, 989 P.2d 800, ¶ 68 (*MonTrust*).

¶88 Montana adheres to the "American Rule" concerning attorney's fees. *Finke v. State ex rel. McGrath*, 2003 MT 48, ¶ 30, 314 Mont. 314, ¶ 30, 65 P.3d 576, ¶ 30. The American Rule provides, generally, that a party in a civil action may not recover attorney's fees absent a specific contractual or statutory provision. *MonTrust*, ¶ 62. This Court has recognized several equitable exceptions to the American Rule, including the private attorney general doctrine. *MonTrust*, ¶ 67.

¶89 The private attorney general doctrine "is normally utilized when the government, for some reason, fails to properly enforce interests which are significant to its citizens." *Matter of Dearborn Drainage Area*, 240 Mont. 39, 43, 782 P.2d 898, 900 (1989). This Court considers three factors when determining whether attorney's fees should be awarded under this doctrine: (1) the strength or societal importance of the public policy vindicated by the litigation; (2) the necessity for private enforcement and the magnitude of the resultant burden on the plaintiff; and (3) the number of people standing to benefit from the decision. *MonTrust*, ¶ 67.

¶90 Sunburst maintains that their action vindicated an important public policy regarding the rights of property owners that will benefit all present and future residents of the town of Sunburst. Sunburst further contends that private enforcement proved necessary in light of DEQ's inaction and that they undertook a significant financial burden litigating this case. Texaco responds that the State properly enforced the rights of

38

the people of Sunburst by acting through DEQ. Texaco further notes that Sunburst had the opportunity to, and did, win a large judgment.

¶91 We agree with Texaco that the private attorney general doctrine provides an incentive for parties to bring public interest related litigation that might otherwise be too costly to bring. *Flannery v. California Highway Patrol*, 61 Cal. App. 4th 632, 635, 71 Cal. Rptr. 2d 632, 635 (Cal. App. Dist. 1998). The private attorney general doctrine "was not designed as a method for rewarding litigants motivated by their own pecuniary interests who only coincidentally protect the public interest." *Flannery*, 61 Cal. App. 4th at 635, 71 Cal. Rptr. 2d at 636. Sunburst's litigation here resulted in a multi-million-dollar judgment. Sunburst needed no additional incentive to file this lawsuit. The District Court abused its discretion by awarding Sunburst's attorney's fees under the private attorney general doctrine.

**CONCLUSION**

¶92 The District Court properly instructed the jury regarding its award of restoration damages in excess of the pre-tort market value of Sunburst's property. CECRA does not preempt a common law action for restoration damages. The availability of restoration damages under the common law leads us to decline to resolve the issue of whether a constitutional tort for monetary damages exists pursuant to Article II, Section 3 of the Montana Constitution for damages caused by a private party. We decline to disturb the District Court's orders prohibiting Texaco from introducing any expert testimony and excluding evidence relating to Texaco's negotiations with DEQ with respect to compensatory damages. We set aside, however, the jury's decision to award punitive

damages and the jury's $25 million award of punitive damages and remand for a new trial on this issue in light of the court's erroneous decision to exclude the same information relating to DEQ. These negotiations could have shed light on Texaco's state of mind and correspondingly whether it acted with actual fraud or actual malice. Finally, we conclude that the possibility of a large damage award provided Sunburst with the necessary incentive to pursue this action to ameliorate its private rights without the extra incentive of a possible award of attorney's fees.

¶93     We affirm in part, reverse in part, and remand for further proceedings.


/S/ BRIAN MORRIS

We Concur:

/S/ W. WILLIAM LEAPHART
/S/ JOHN WARNER
/S/ JIM RICE


Justice James C. Nelson, concurring in part and dissenting in part.

¶94     Except as to the reversal and remand for a new trial on punitive damages (Opinion, ¶¶ 81-86 and 92), I concur in the Court's Opinion, with one caveat.

¶95     I read ¶¶ 60-64 of the Opinion to hold that we are not rejecting, *per se*, a constitutional tort for violation of the fundamental right to a clean and healthful environment, Mont. Const. art. II, § 3, since here, having adopted Restatement (Second) of Torts § 929 and cmt. b (allowing restoration damages for injury to real property; *see* Opinion, ¶¶ 32-39), an award of damages for violation of Article II, Section 3, would be redundant. I concur in the Court's Opinion on this limited basis, recognizing that a future

40

case may present a factual and legal scenario that might well require us to address the constitutional tort theory on the merits.

¶96 As to the reversal and remand for a new trial on punitive damages, however, I dissent. The Court observes that punitive damages may be awarded under § 27-1-221, MCA, when a defendant has been found to have acted with actual fraud or actual malice and that the defendant's state of mind "represents a key element in determining whether a defendant acted with actual fraud or actual malice." Opinion, ¶ 81. The Court then reasons that evidence relating to DEQ's involvement with the site remediation in the 1980s, 1990s, and 2000s and Texaco's attempted compliance with CECRA would be "relevant to the issue of punitive damages," Opinion, ¶ 83, and that the District Court, therefore, abused its discretion by excluding this evidence for purposes of considering the appropriateness of punitive damages, Opinion, ¶ 85.

¶97 I disagree with this reasoning for two reasons. First, the Court's premise that the evidence at issue here was "relevant to the issue of punitive damages" is incorrect. That evidence was entirely *irrelevant* and, therefore, was properly excluded. M. R. Evid. 402. Second, even assuming, *arguendo*, that the evidence was relevant, it does not follow that the evidence *had* to be admitted. To the contrary, the District Court had discretion under M. R. Evid. 403 to exclude the evidence, and I believe that the court did not abuse its discretion in doing so here. Accordingly, in my view, the Court errs in vacating the jury's verdicts on punitive damages and remanding this case for a new trial on both liability for and the amount of such damages.

<u>The Evidence at Issue was Irrelevant</u>

41

¶98     In its first Special Verdict, the jury found Texaco "guilty of actual malice and/or actual fraud . . . with respect to [its] conduct in Sunburst so as to impose punitive damages," and in its second Special Verdict, the jury set the amount of such damages at $25 million. Thereafter, the District Court reviewed the jury's punitive damages award and entered findings of fact and conclusions of law pursuant to § 27-1-221(7)(c), MCA (stating that a jury's award of punitive damages shall be reviewed by the court to determine whether the award should be increased or decreased, and instructing the court to state in findings of fact and conclusions of law the reasons for increasing, decreasing, or not increasing or decreasing the award).

¶99     In its findings of fact and conclusions of law, the District Court observed that "[Texaco's] wrongdoing spans 50 years." With respect to the period during which Texaco operated its refinery near Sunburst (1924 to 1961), the court found that

> Texaco frequently allowed gasoline and other substances to spill and leak throughout the refinery grounds. . . . Texaco's careless operations resulted in the migration of hundreds of thousands of gallons of gasoline into the town of Sunburst. . . . Texaco's operations were conducted recklessly and maliciously, as those terms are defined by Montana law.

¶100    With respect to the period after Texaco had become aware of the contamination—which began at least as early as 1955, when escaping fumes from the underground plume caused a house in Sunburst to explode—the District Court found that "the pollution in Sunburst was ignored for a number of decades." Then, in the late 1980s and early 1990s, Texaco began a new investigation of the environmental damage caused by its former refinery and learned that pollution from the refinery remained in the ground in Sunburst

42

and on private property. The District Court found, however, that "[f]or the past 15 years" (i.e., from 1989 to 2004), Texaco "ha[s] engaged in a widespread pattern of deceitful and reprehensible conduct."

¶101 The court cited several specific examples of such "deceitful and reprehensible conduct" on the part of Texaco during this period, including the following:

• Texaco "communicated with the public over the course of the last 15 years concerning its investigation [of the environmental damage caused by its former refinery]" but "consistently minimized the problem and failed to accurately report [its] findings." The court found that Texaco had been "motivated by [its] own financial interests, rather than the interests of the plaintiffs and other members of the community" and that Texaco had "endeavored to save money with full knowledge that the plaintiffs and their property would be harmed as a result."

• Texaco "made numerous affirmative misrepresentations concerning the pollution in Sunburst" and "mischaracterized data for the purpose of avoiding the expense of meaningful cleanup." As an example, the court cited a newsletter distributed to Sunburst residents in 2001 which "mischaracterized data gathered from two different wells." Although Texaco acknowledged this mischaracterization and claimed it was an honest mistake, the court noted that "the evidence revealed too many 'mistakes' on the part of [Texaco], and on each occasion, the 'mistake' would portray conditions favorable to [Texaco]."

• Texaco "advised the public, and even maintained at trial, that nature would cleanup the pollution in Sunburst." Yet, Texaco's representatives admitted at trial that "several of the necessary criteria for application of natural attenuation were not present" and that "natural attenuation might not work for more than 100 years, if at all." Significantly, the court observed that "substantial evidence established that [Texaco's] proposal to use natural attenuation was not scientifically supportable." "Viewing the evidence as a whole," the court found that Texaco had "recommended a cleanup method which will not work for the express purpose of saving money." The court also found that Texaco had "misrepresented facts and utilized unsupportable scientific methods to further that objective, while disregarding the resulting harm to the plaintiffs, the community of Sunburst, and the environment."

¶102 Summing up Texaco's intent in committing the wrongdoing to which the punitive damages award was directed, the court observed as follows:

43

[Texaco] knew many of the plaintiffs' properties were polluted by carcinogenic compounds. Nonetheless, [Texaco] attempted to sweep the problem under the rug to avoid the financial burden of a cleanup and realize a savings of millions of dollars. [Texaco] took advantage of [its] superior technical knowledge to mislead an entire community which had placed a great deal of trust in [Texaco] to do the right thing.

¶103 In light of these findings by the District Court, Texaco's state of mind during the 1980s, 1990s, and 2000s clearly informed the determinations of its liability for and the amount of punitive damages in this case.[1] Texaco complains on appeal, therefore, that it should have been allowed to present evidence relating to DEQ's involvement with the site remediation—e.g., evidence "that [Texaco's] actions were in full compliance with DEQ's directions" and "that [Texaco] had been trying to repair any harm by cooperating with DEQ." Texaco is mistaken.

¶104 The evidence of DEQ's involvement with the site remediation in the 1980s, 1990s, and 2000s was not relevant to Texaco's state of mind during that period. At the pretrial hearing on the parties' motions in limine, counsel for Texaco explained one of the purposes of this evidence, as follows:

[T]he role of the DEQ is absolutely critical to the plaintiffs' theories about punitive damages. We heard at great length from [counsel for plaintiffs] earlier this morning that Texaco switched the wells, that we omitted data from one well, that we provided a biased analysis. The consumer of this information in large measure was the DEQ. Whether the DEQ feels it was misled or lied to or somehow duped by Texaco, of course, is very critical to Texaco's defense in this case.

---

[1] With respect to the amount of the award, the District Court stated that the jury's determination that $25,000,000 was the appropriate amount of punitive damages was "supported by the evidence, as well as the factors this Court must consider in reviewing the award." In addition, the court observed that "[a]s set forth above, [Texaco's] conduct in this case was egregious, and the jury's award was justified based on that conduct."

44

This argument is patently without merit. DEQ was not a plaintiff in this case, and so evidence of whether DEQ "felt" it had been "misled or lied to or somehow duped by Texaco" was wholly irrelevant.

¶105 A second and similar purpose of the proffered evidence was explained as follows:

> [COUNSEL FOR TEXACO]: . . . [T]he plaintiffs want to cast this case as Texaco of its own volition trying to manipulate the data and trying to mislead the public and conducting a biased investigation.
> THE COURT: Or at least control the data.
> [COUNSEL FOR TEXACO]: True. And again, if it's going to come down to their word against Texaco's word, it's relevant to have a third party, which has been intimately involved in this process, give its views about Texaco's conduct.

Again, on the question of whether Texaco was guilty of actual fraud or actual malice *in relation to plaintiffs*, DEQ's views about Texaco's conduct *in relation to DEQ* were wholly irrelevant; and there is absolutely no basis in the record for concluding that DEQ's representatives were competent (in the legal sense[2]) to testify as to Texaco's conduct *in relation to plaintiffs*. Moreover, it was the jury's—not DEQ's—responsibility to weigh "[plaintiffs'] word against Texaco's word" and decide whom to believe. Texaco, apparently anticipating a favorable assessment by DEQ's representatives, would have had the jury simply defer to DEQ's views on this matter. The District Court properly rejected Texaco's effort.

¶106 It appears that a third purpose of the proffered evidence was to shift blame for plaintiffs' injuries from Texaco to DEQ. Counsel for Texaco explained that "the

---

[2] M. R. Evid. 602 states that "[a] witness may not testify as to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."

45

subsurface investigation and the feasibility study, as with all the other work that has been done out in Sunburst by Texaco and its consultants, it has been done under the supervision and guidance of the DEQ." Counsel went so far as to assert that "Texaco cannot just act on its own" and that "Texaco is constrained by [the 1989 consent decree] and by what the DEQ wishes it to do out there." Similarly, Texaco argues on appeal that "[u]nder the terms of the Consent Order, DEQ set 'clean-up objectives, clean-up standards, and assessments of health and environmental risks.' [Citation to Consent Order.] Texaco should have been allowed to show that DEQ could and did change Texaco's work plans."

¶107 As the District Court pointed out, however: "[W]hat I could see happening here is that [Texaco] might be wrapping [itself] in the cloak of DEQ . . . . Or taking it in a different direction, saying we're blameless. We're just doing what DEQ told us to do." The court noted that this strategy "almost approaches the empty chair defense," an apt characterization with which I agree.

¶108 Moreover, governmental agency regulations and orders afford neither an explanation nor an excuse for egregious conduct on the part of a defendant. In this regard, the Court asserts that "[a] good-faith effort to comply with all government regulations 'would be evidence of conduct inconsistent with the mental state requisite for punitive damages.' " Opinion, ¶ 81 (quoting *Silkwood v. Kerr-McGee Corp.*, 485 F. Supp. 566, 584 (W.D. Okla. 1979)). Actually, what the *Silkwood* court said was: "*Good faith belief in*, and efforts to comply with, all government regulations would be evidence of conduct inconsistent with the mental state requisite for punitive damages."

46

*Silkwood*, 485 F. Supp. at 584 (emphasis added). This distinction is important, because "[a] good-faith effort to comply with all government regulations," Opinion, ¶ 81—as opposed to "[g]ood faith belief in, and efforts to comply with, all government regulations," *Silkwood*, 485 F. Supp. at 584—is *not* relevant evidence of a defendant's state of mind for purposes of determining the appropriateness of punitive damages.

¶109 In *Silkwood*, the court explained that it is *the character of the defendant's conduct* and *the state of the defendant's mind* which control the propriety of punitive damages, not merely whether that conduct complies or fails to comply with a government regulation:

> For the same reason that mere compliance with government regulations cannot necessarily be found consistent with the reasonable person standard, so too it cannot necessarily be found consistent with an attitude and conduct devoid of that state of mind for which an award of punitive damages is appropriate.
>
> As in the drug and aviation cases noted above, a manufacturer may be found to have duties in addition to or different from those prescribed by regulation. A mere failure to act as a reasonable person in conformity with that duty would constitute negligence. A knowing and intentional disregard of that duty might under some circumstances constitute the gross recklessness and indifference to the safety of others that render punitive damages appropriate.
>
> No one could argue, for example, that a manufacturer who knew that its drug would cause blindness would not be responsible for punitive damages for knowingly marketing that product for profit, even though the drug had been approved for distribution and marketing after compliance with all FDA regulations. Similarly, no one would question the propriety of punitive damages assessed against an airplane manufacturer who, for example, knew that its plane was defectively designed and could crash during flight, notwithstanding that the manufacturer had complied with all government regulations and obtained an FAA certificate for the craft as airworthy.
>
> Similarly, Kerr-McGee's argument that compliance with regulations would still permit the escape of small quantities of plutonium overlooks the circumstances where punitive damages might be appropriate for damages

caused through that escape. Surely defendants would not argue that punitive damages would be inappropriate if a nuclear licensee knew of the time and manner of the plutonium's escape, but did nothing to prevent it because the regulations did not require it. Similarly, if a licensee were aware of defects within its facility that would render likely repeated exposures of employees to plutonium, but did nothing to correct it, as some evidence in this case indicated, punitive damages might be considered, regardless whether government regulations required those changes to be made. *The character of the conduct and the state of the actor's mind control the propriety of punitive damages, and not merely whether that conduct complies or fails to comply with a government regulation.*

*Silkwood*, 485 F. Supp. at 583-84 (emphasis added, citations omitted).

¶110 Likewise, in the case at hand, if Texaco proceeded with a particular course of action that it knew created a high probability of injury to plaintiffs, § 27-1-221(2), MCA, then it cannot escape liability for punitive damages simply because DEQ approved that course of action. More to the point, DEQ's having approved a course of action could *never*, in the context of punitive damages, be an explanation for "why [Texaco] acted as it did, or failed to act, whatever the case may be," Opinion ¶ 84, because, for one thing, Texaco's duties to plaintiffs in this case are defined by common law, not DEQ or CECRA, and, more importantly, a DEQ order is *never* a valid reason for deliberately proceeding to act in conscious or intentional disregard of, or with indifference to, the high probability of injury to plaintiffs, § 27-1-221(2)(a)-(b), MCA, for making representations with knowledge of their falsity, § 27-1-221(3)(a), MCA, or for concealing material facts with the purpose of depriving plaintiffs of property or legal rights or otherwise causing injury, § 27-1-221(3)(b), MCA. Simply put, Texaco cannot explain why it engaged in egregious conduct by pointing out that DEQ approved—or even directed—that conduct.

¶111 Notably, Texaco in fact conceded this point in response to questioning by the District Court:

> THE COURT: Would Texaco do something if they thought DEQ was wrong? I mean --
> [COUNSEL FOR TEXACO]: Yes. We can exhaust all --
> THE COURT: If you had let DEQ lead you down the garden path and say, do this, do that, you would go through the process, the administrative process and appeal their mandates, I'm sure.
> [COUNSEL FOR TEXACO]: Yes.

Indeed, if Texaco had reason to believe that DEQ's mandates would create a high probability of injury to plaintiffs, then Texaco's proper course of action was to appeal those mandates, not to implement them and then attempt after the fact to justify having done so by shifting the blame to DEQ.

¶112 For these reasons, I conclude that the proffered evidence of Texaco's compliance with DEQ's directions and with CECRA was not relevant on the issue of punitive damages.

### Even if the Evidence at Issue was Relevant, the District Court did not Abuse its Discretion in Excluding It

¶113 Even assuming, *arguendo*, that the proffered evidence *was* probative of Texaco's state of mind during the 1980s, 1990s, and 2000s, Texaco's claim that it should have been allowed to present the evidence is mistaken for a second reason.

¶114 Evidence is not necessarily admissible simply because it is relevant. Indeed, M. R. Evid. 403 specifically states that

> *[a]lthough relevant*, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence [emphasis added].

49

For this reason, the Court's assertion in ¶ 84 that "[a] district court may not categorically exclude . . . evidence tending to show why the defendant acted as it did, or failed to act, whatever the case may be, when a jury considers whether to award punitive damages" is flat wrong. To the contrary, such evidence "may" be excluded pursuant to Rule 403; and the question here, therefore, is whether the District Court erred in its determination that the probative value of evidence relating to DEQ's involvement with the site remediation in the 1980s, 1990s, and 2000s and Texaco's attempted compliance with CECRA was substantially outweighed by any of the Rule 403 considerations.

¶115 In this regard, when reviewing a district court's evidentiary rulings, we do not determine whether this Court would have made the same ruling. Rather, we determine whether the district court abused its discretion. *Seltzer v. Morton*, 2007 MT 62, ¶ 65, 336 Mont. 225, ¶ 65, 154 P.3d 561, ¶ 65 (citing *Lopez v. Josephson*, 2001 MT 133, ¶ 14, 305 Mont. 446, ¶ 14, 30 P.3d 326, ¶ 14). To prevail on a claim that the district court abused its discretion, "the appellant must demonstrate that 'the district court acted arbitrarily without conscientious judgment or exceeded the bounds of reason.' " *Seltzer*, ¶ 65 (quoting *Lopez*, ¶ 14). Here, while Texaco dedicates a significant portion of its opening brief to explaining why the DEQ- and CECRA-related evidence would have provided crucial insight into Texaco's state of mind during the 1980s, 1990s, and 2000s, Texaco fails to demonstrate how the District Court "acted arbitrarily without conscientious judgment" or "exceeded the bounds of reason" when it excluded that evidence.

¶116 And a similar paucity of analysis afflicts the Court's Opinion. The Court opines that the excluded evidence "bears on whether Texaco acted with 'deliberate indifference,' whether Texaco knowingly concealed any material facts, and the size of any appropriate punitive award." Opinion, ¶ 84. If true, however, this merely establishes that the evidence is relevant, not that the District Court "acted arbitrarily without conscientious judgment" or "exceeded the bounds of reason" when it excluded the evidence.

¶117 Indeed, it is unclear from the Court's Opinion how the District Court abused its discretion. Perhaps the District Court's error was in "disabling Texaco from explaining itself." Opinion, ¶ 84. Yet, by its own admission, Texaco sought to present the excluded evidence so that the jury would know "[w]hether the DEQ feels it was misled or lied to or somehow duped by Texaco." In addition, according to Texaco, "if it's going to come down to [plaintiffs'] word against Texaco's word, it's relevant to have a third party, which has been intimately involved in this process, give its views about Texaco's conduct." These hardly constitute excluded "explanations" of Texaco's misconduct; and I cannot agree that Texaco should have been permitted to place the blame for its misconduct on DEQ (the empty chair defense) by presenting evidence that "the subsurface investigation and the feasibility study, as with all the other work that has been done out in Sunburst by Texaco and its consultants, it has been done under the supervision and guidance of the DEQ." Texaco's misconduct was what it was, and it cannot be justified or mitigated, after the fact, by shifting blame to DEQ.

¶118 Arguably, Texaco's compliance and cooperation with DEQ's directions does explain its conduct during the 1980s, 1990s, and 2000s to an extent. But evidence of that

51

compliance and cooperation does not bear on the specific questions before the jury: whether Texaco acted in conscious or intentional disregard of, or with indifference to, the high probability of injury to plaintiffs, § 27-1-221(2)(a)-(b), MCA, whether Texaco made representations with knowledge of their falsity, § 27-1-221(3)(a), MCA, and whether Texaco concealed material facts with the purpose of depriving plaintiffs of property or legal rights or otherwise causing injury, § 27-1-221(3)(b), MCA. As such, as explained above, the evidence has no probative value in determining liability for and the amount of punitive damages.

¶119 Moreover, such evidence is properly excluded in a case such as this, where there is a very real danger that the evidence will confuse the issues and mislead the jury. Texaco's interactions with DEQ spanned only fifteen of the fifty years at issue in this case. Therefore, there are thirty-five years of conduct by Texaco before DEQ came onto the scene for the jury to evaluate. This bifurcation of timeframes by itself renders the late interjection of DEQ difficult for the jury to incorporate into the punitive damages analysis.

¶120 Furthermore, as discussed above, a DEQ order is *never* a valid reason for deliberately proceeding to act in conscious or intentional disregard of, or with indifference to, the high probability of injury to plaintiffs, for making representations with knowledge of their falsity, or for concealing material facts with the purpose of depriving plaintiffs of property or legal rights or otherwise causing injury. Unfortunately, however, a jury could be led to conclude that because Texaco's conduct was apparently

sanctioned by the State, Texaco cannot be held responsible for that conduct or Texaco cannot be guilty of actual fraud or actual malice.

¶121   The high danger of confusing the issues, misleading the jury, and wasting time was one of the specific rationales relied on by the District Court.  In its order granting plaintiffs' motion to exclude the DEQ- and CECRA-related evidence, the court observed that allowing such evidence "would unnecessarily lengthen the trial and cause undue confusion."  And in its order denying Texaco's motions for new trial and for judgment as a matter of law, the court reiterated its view that

> by offering evidence concerning the [DEQ] in its decisions, [Texaco] sought to cloak [itself] in the authority of the State of Montana.  The State of Montana was not a party to this case, and its conduct was not at issue. The Court allowed Texaco to defend its own actions without shifting responsibility to an unnamed party.

¶122   Indeed, there is no merit to Texaco's claim on appeal that "The Trial Was Not Fair" because of what Texaco perceives as "the one-sided nature of the evidence permitted at trial."  In my view, the District Court's decision to exclude the DEQ- and CECRA-related evidence was abundantly prudent and amply supported by the record. The probative value of that evidence—to the extent there was any probative value—was substantially outweighed by the high likelihood of confusing the issues, misleading the jury, and wasting time.  M. R. Evid. 403.

## Conclusion

¶123   In sum, the Court concludes that Texaco's state of mind in the 1980s, 1990s, and 2000s might be explained away or mitigated by its interactions with DEQ during that period.  The Court is incorrect.  The questions before the jury on the issue of Texaco's

liability for punitive damages were whether Texaco, during and after it operated its refinery, acted in conscious or intentional disregard of, or with indifference to, the high probability of injury to plaintiffs, made representations with knowledge of their falsity, or concealed material facts with the purpose of depriving plaintiffs of property or legal rights or otherwise causing injury. Section 27-1-221(2)-(3), MCA. Evidence that Texaco complied and cooperated with DEQ's mandates has no probative value in deciding these questions and, thus, was properly excluded as irrelevant. M. R. Evid. 402.

¶124 Furthermore, even assuming, *arguendo*, that this evidence was relevant, the District Court had discretion to exclude it nonetheless pursuant to M. R. Evid. 403. We review a district court's discretionary rulings for abuse of discretion, asking whether the court acted arbitrarily without conscientious judgment or exceeded the bounds of reason. On the record before us, the District Court clearly did not act arbitrarily without conscientious judgment. To the contrary, the court's dialogue with counsel for each party during the hearing on plaintiffs' motion to exclude the DEQ- and CECRA-related evidence demonstrates that the court put substantial thought into this issue, and there is nothing in the court's stated reasons for granting the motion to indicate that the court's ruling was founded on prejudice or preference, as opposed to the law. Likewise, the court's ruling was well within the bounds of reason, given the danger that Texaco's proffered evidence of its interactions with DEQ would confuse the issues and mislead the jury in its consideration of the appropriateness of punitive damages. Accordingly, there is no basis for concluding that the District Court abused its discretion, for vacating the jury's verdicts on punitive damages, and for remanding this case for a new trial.

¶125 The unfortunate consequence of the Court's decision today will be senseless expenditures of time and money on the parts of the District Court, the litigants, and the jurors, who on remand must retry Texaco's liability for punitive damages and, in a separate proceeding (*see* § 27-1-221(7)(a), MCA), redetermine the appropriate amount of such damages, taking into account what is plainly irrelevant evidence of Texaco's compliance with government regulations and DEQ's views about Texaco's conduct.

¶126 After Texaco presents this evidence on remand, the jury must be instructed that the evidence is *not* dispositive of the question of whether Texaco is guilty of actual fraud or actual malice. Such evidence presents not a "danger," but an inevitability of confusing the issues and misleading the jury. "The character of the conduct and the state of the actor's mind control the propriety of punitive damages, and not merely whether that conduct complies or fails to comply with a government regulation." *Silkwood*, 485 F. Supp. at 584. The jury must be so instructed.

¶127 In conclusion, except as to the reversal and remand for a new trial on punitive damages (Opinion, ¶¶ 81-86 and 92), from which I dissent, I otherwise concur in the Court's Opinion—though, with respect to our discussion of the constitutional tort theory at ¶¶ 60-64, I concur on the limited basis stated in ¶ 95 above.

/S/ JAMES C. NELSON

Justice Patricia O. Cotter joins in the Concurrence and Dissent of Justice James C. Nelson.

/S/ PATRICIA COTTER

55

Chief Justice Karla M. Gray, concurring in part and dissenting in part.

¶128 I concur in the results the Court reaches on all issues, but do not join in several aspects of the Court's reasoning, particularly where the Court fails to address either the record before us or the arguments presented and where it unnecessarily relies on authorities from other jurisdictions. I respectfully, but vigorously, disagree with the Court's characterization of Texaco's Article II, § 3-related argument in Issue 3 as a challenge to any damages other than the restoration costs award, or to the viability of Sunburst's constitutional tort claim. I also note Texaco frames its CECRA and Article II, § 3-related arguments—addressed by the Court in Issues 2 and 3—as separate issues in its statement of issues, but briefs them as subparts of its overarching argument pertaining to the availability of restoration costs pursuant to the footnote exception to the *Burk Ranches* permanency presumption. To the extent that the results of Issues 2 and 3 are to affirm the restoration costs award on this record, I concur with the Court.

**Restoration costs—Issue 1**

¶129 Regarding Issue 1, I respectfully disagree with the Court's adoption of the "personal use" rule (sometimes called "reasons personal") from the Restatement (Second) of Torts § 929 and comment b thereto—and its apparent determination that the "personal use" rule satisfies the footnote exception to the *Burk Ranches* permanency presumption here—because I do not believe the "personal use" rule sufficiently fits the facts of this case. In this respect, I also disagree with the breadth of the Court's statements in ¶¶ 38-39, insofar as the Court suggests that other courts have held the "personal use" rule

56

applies whenever a court determines diminution in value is not "adequate"—without requiring a record showing of "personal use"—and that "collateral beneficiaries" may recover restoration damages based solely on other plaintiffs' "personal uses."

¶130 The record is largely silent on most plaintiffs' use of their properties; however, it does reflect that the plaintiffs include the partnership Sonnemaker Farms, estates of deceased property owners, people whose listed addresses are not in Sunburst, and the school district. Only six of the approximately 90 plaintiffs testified at trial. School board representative Linda Clark responded affirmatively when asked if she was "just generally" familiar with how the school property was utilized, and stated she did not know if a particular building was used for equipment storage. Property owner Donald Revell testified he had moved to Troy and was trying to sell his Sunburst property at the time of trial. Ray Schock stated his property included not only his home, but also four lots that he had at one time considered selling.

¶131 This record falls far short of supporting the Court's implied presumption that all—or even most—of the plaintiffs had residential or other "personal uses." As set forth in *Roman Catholic Church*, plaintiffs seeking restoration damages under the "personal use" rule must actually establish a "personal use"—a residential or other "not purely financial" personal interest in the property—and that they would restore the property to facilitate a non-income-producing use. *Roman Catholic Church*, 618 So.2d at 878-80. It is my view that, at most, the "personal use" rule would apply in this case only to testifying plaintiffs who established a residential or other personal use and to the school district, insofar as its use and interest were "not purely financial." The Court's broad application of § 929 and

57

comment b in this case totally swallows the "personal use" and "not purely financial interests" components of the rule it has adopted. I cannot agree.

¶132   Moreover, I believe the Court's statement of the "personal use" rule is much more rigid than the language of the out-of-state cases from which the Court derives it. In ¶ 33, the Court cites to the Colorado *Fowler Trust* and *Slovek* cases for the proposition that diminution in value will not restore a plaintiff who resides on damaged real property to the same position as before any tort was committed. As set forth in *Fowler Trust*, however, *Slovek* states a trial court has *discretion to select* restoration costs as an appropriate remedy; to facilitate appellate review, a trial court should articulate its reasons for awarding restoration costs as opposed to diminution in value; and "the factors that merit awarding restoration costs are not fixed, and . . . to make them so would forfeit the flexibility trial courts need to achieve fair results." *Fowler Trust*, 17 P.3d at 805 (citing *Slovek*, 723 P.2d at 1315-17).

¶133   In ¶ 34, the Court accurately cites to *Roman Catholic Church* for the statement— which, there, is a quote from a 1973 treatise on remedies—that the "only" remedy for property damage is restoration costs when the plaintiff wishes to use, rather than sell, the property. What the Court totally fails to acknowledge, however, is that the *Roman Catholic Church* opinion "book-ends" that quote with statements that "no mechanical rule can be applied with exactitude . . . [and] every case must rest on its own facts and circumstances[,]" and "'[r]ules governing the proper measure of damages in a particular case are guides only and should not be applied in an arbitrary, formulaic, or inflexible manner, particularly where to do so would not do substantial justice.'" *Roman Catholic*

58

*Church*, 618 So.2d at 877 (citations omitted).  In my view, *Roman Catholic Church*—read as a whole—emphasizes flexibility and the need for case-by-case analysis.  The "only" statement from that decision cannot properly be read in isolation.

¶134  In sum, I believe the out-of-state "personal use" rule cases cited by the Court are consistent with existing Montana jurisprudence providing for flexibility and case-specific considerations, which I discuss further below.  Along similar lines, I strongly disagree with the Court's intimation in ¶¶ 45-49 that a "strict cap" for property damages heretofore has existed in Montana, and its suggestion in ¶ 37 that the new "personal use" rule satisfies a previously unmet need for flexibility.  If the record supported adoption of the "personal use" rule here, I would neither frame the rule in a manner that categorically limits the remedies available to compensate a plaintiff for property damage, nor remove discretion from a trial court to consider the circumstances of the case before it.

¶135  Finally, regarding my disagreement with the Court's adoption of the "personal use" rule, I do not believe the parties' arguments justify it in this case.  Texaco's opening brief does not refer to the "personal use" rule at all.  Sunburst's response brief contains one sentence stating the properties at issue include homes and two schools, and another sentence quoting from Restatement (Second) of Torts § 929 and comment b, as well as a "see also" citation to *Roman Catholic Church* and *Slovek*.  In its reply brief, Texaco properly discusses Sunburst's reference to "personal use"—including an assertion, unsupported by the record, that Sunburst did not preserve the "personal use" argument.  In my view, Sunburst's scant "personal use" assertion and Texaco's reply warrant neither adopting the "personal use" rule nor affording it the status it reaches in the Court's

59

Opinion.

¶136 Turning now to the record before us and Texaco's arguments on appeal, Sunburst moved for partial summary judgment on the issue of whether restoration damages were recoverable. Texaco responded to that motion and, in the same document, moved in limine to exclude evidence of alternative restoration proposals—meaning Sunburst's proposals, which had not been selected by DEQ. Texaco also filed a separate motion in limine to exclude evidence of alternative remediation options—the same Sunburst options not selected by DEQ—under the doctrine of primary jurisdiction.

¶137 Sunburst's arguments in support of its motion for partial summary judgment on restoration costs were that: (1) the injury in this case was temporary, in light of evidence including Texaco representatives' deposition testimony; (2) while some courts have traditionally limited damages for temporary injury to the lesser of restoration costs or diminution in value, other courts and commentators have reasoned that this limitation does not always adequately restore plaintiffs to their pre-injury positions, especially in cases involving expensive environmental remediation; (3) the footnote exception to the *Burk Ranches* permanency presumption constitutes Montana's recognition of public policy reasons for not limiting damages in certain cases, including environmental cases; and (4) Montana public policy, as articulated in the Montana Constitution and this Court's cases on environmental and property issues, satisfies the footnote exception to the *Burk Ranches* permanency presumption.

¶138 The District Court initially took both Sunburst's motion and Texaco's motions in limine under advisement, but subsequently allowed Sunburst to present evidence of

alternative remediation methods at trial and instructed the jury to award restoration costs. In its post-trial order denying Texaco's motions for a new trial and for judgment as a matter of law, the District Court recited the *Burk Ranches* permanency presumption, which generally provides that an injury is presumed permanent—such that diminution in value is the appropriate remedy—when the cost of repair greatly exceeds diminution in value. *See Burk Ranches*, 242 Mont. at 307, 790 P.2d at 447. The court then reasoned:

> [t]he [*Burk Ranches*] court also stated, however, that the presumption of permanence is rebuttable, and that restoration damages exceeding the property's decreased value can be recovered when the circumstances of the case compel repair or replacement of the property. [Citation omitted.] The Court finds the circumstances of this case compel repair of the property. The defendants admit their former operations resulted in pollution of properties owned by the plaintiffs. Limiting those plaintiffs to recovery of diminished property value would do nothing to correct the environmental insult at issue. Under Article II, § 3 of the Montana Constitution, all persons have a fundamental inalienable right to a clean and healthful environment. [Citation omitted.] Restricting the plaintiffs to diminished property value under these circumstances would render that right meaningless. Montana's strong public policy of environmental preservation is furthered by allowing recovery of restoration damages which will be used to remove pollution from the environment.

¶139 By my reading, the District Court largely adopted Sunburst's argument that the footnote exception to the *Burk Ranches* permanency presumption was satisfied here because Montana public policy, as articulated in Article II, § 3 and otherwise, required an award for cleanup rather than an award of diminution in value. In light of this reasoning, I turn to Texaco's arguments on appeal.

¶140 Texaco first asserts the District Court failed to apply the "general rules" limiting the measure of damages in property tort cases. In this regard, Texaco cites to *Burk Ranches*, *Kebschull v. Nott*, 220 Mont. 64, 67, 714 P.2d 993, 995 (1986), and 25 C.J.S.

61

*Damages* § 84 (1966) for the proposition that, in a case involving injury to land, the appropriate measure of damages is the difference between the property's values before and after the injury. Texaco also cites to *Spackman* for the proposition that "[r]ecovery ordinarily may not exceed the value of the property just before it was damaged." *See Spackman*, 147 Mont. at 507, 414 P.2d at 922.

¶141 *Spackman* involved sewage flooding, which the plaintiffs claimed had damaged their basement floor and various items of personal property. *Spackman*, 147 Mont. at 502-04, 414 P.2d at 920. There, we stated the question of how to compensate plaintiffs for property damage is "always a difficult one," and noted the purpose of compensatory damages is to make the injured party as nearly whole as possible, not to allow realization of a profit. *Spackman*, 147 Mont. at 506, 414 P.2d at 921. The Court also reasoned:

> [i]ngenious men have propounded ingenious methods, systems and formulas for determining in monetary terms the value of property partially damaged or destroyed. While such methods serve as useful guides, the final answer rests in good sense rather than mechanical application of such formulas.

*Spackman*, 147 Mont. at 506, 414 P.2d at 921-22. Finally, the Court adopted the formula regarding pre-injury market value "as a guide to common sense," and then stated:

> [a]nother guide or measure concerns property damaged but not totally destroyed, in which case the generally accepted estimate of damages is the difference in market value at the place before and after injury. But if repair is possible, and this cost is less than the diminution in value under the general test, this cost plus the value of the loss of use may be employed as the measure. In either case, the recovery ordinarily may not exceed the value of the property just before it was damaged. See generally Damages to Persons and Property, Oleck, 1961 Ed., § 202, p. 363.
>
> The above principles guide us toward good judgment and fair compensation.

*Spackman*, 147 Mont. at 507, 414 P.2d at 922.

¶142 Subsequent cases confirm *Spackman*'s common sense approach that Montana courts will determine the appropriate remedy under § 27-1-317, MCA, by employing certain rules as "guides," not by applying them rigidly or mechanistically. In *Bos*—which involved damage to a silo—we quoted the "difficult question" language from *Spackman*, before discussing the basic objective of making the party whole in light of the "particular fact situation" at issue and determining the guides to measures of damages set forth in *Spackman* were "clearly not applicable." *Bos*, 167 Mont. at 6-8, 534 P.2d at 1260-61. In *Whitaker v. Farmhand, Inc.*, 173 Mont. 345, 355-56, 567 P.2d 916, 922 (1977), we noted that *Spackman* sets forth "useful guides" not to be mechanically applied. *See also Chandler*, 197 Mont. at 242-43, 642 P.2d at 1033; *Kebschull*, 220 Mont. at 66, 714 P.2d at 994. In *Kebschull*, we concluded, as quoted by Texaco in its opening brief, that "the measure of damages *in this case* must be the difference between the value of the property before and after the fire." *Kebschull*, 220 Mont. at 67, 714 P.2d at 995 (emphasis added). In *Burk Ranches*, before setting forth the "general rule," we observed that "no single measure of damages can serve in every case to adequately compensate an injured party[.]" *Burk Ranches*, 242 Mont. at 305, 790 P.2d at 445-46.

¶143 In asserting the District Court erroneously failed to apply the "general rules" to preclude recovery of restoration costs, Texaco has not attempted to analogize or distinguish the facts or analyses in our prior cases. A district court's decision is presumed correct, and the appellant has the burden of establishing error. *In re Marriage of McMahon*, 2002 MT 198, ¶ 7, 311 Mont. 175, ¶ 7, 53 P.3d 1266, ¶ 7 (citation omitted).

63

I conclude Texaco has not met its burden of establishing error by merely reciting flexible and case-specific rules and stating they apply here.

¶144 Texaco next advances the *Burk Ranches* permanency presumption, which states "[e]ven though repair is theoretically possible, if the cost of repair greatly exceeds the [diminution in value] of the property, the injury is presumptively permanent and the [diminution in value] rule applies." *Burk Ranches*, 242 Mont. at 307, 790 P.2d at 447. Texaco contends the District Court improperly refused to instruct the jury to decide whether the injury was permanent and, in support, advances *Burk Ranches*' statement that "[w]hether an injury is permanent or temporary is a question for the jury." *Burk Ranches*, 242 Mont. at 306, 790 P.2d at 446-47 (citations omitted). Alternatively, Texaco asserts error in the District Court's failure to apply the permanency presumption as a matter of law.

¶145 Regarding Texaco's argument that the District Court failed to submit the "temporary or permanent" question to the jury, *Burk Ranches* defines the "temporary" and "permanent" categories of injury in terms of whether the injury is abatable, or whether the circumstances and character of the injury are such that it is presumed to continue indefinitely. *Burk Ranches*, 242 Mont. at 306, 790 P.2d at 447 (citations omitted). In its order denying Texaco's motions for judgment as a matter of law and for a new trial, the District Court reasoned that some cases may present an issue of fact regarding whether an injury is permanent or temporary, but Texaco had provided no evidence in this case suggesting the injury was permanent. On appeal, Texaco challenges neither this reasoning, nor similar reasoning in other District Court orders that all

64

evidence submitted before trial established the injury was abatable. Thus, I conclude that Texaco has not established error regarding the court's failure to present the "temporary or permanent" question to the jury.

¶146 With respect to Texaco's assertion that the District Court erred in failing to apply the permanency presumption as a matter of law, the parties agree the restoration costs in this case "greatly exceed" the diminution in value. Thus, their arguments center on whether the District Court erred in applying the *Burk Ranches* footnote exception, under which the permanency presumption "can be overcome by statutory and common laws, such as environmental laws, which compel repair or replacement." *Burk Ranches*, 242 Mont. at 307 n.3, 790 P.2d at 447 n.3.

¶147 Texaco asserts Sunburst has not claimed that restoration damages were compelled by any "specific" environmental law. The word "specific" does not appear in the footnote exception and, in any event, the District Court cited to Article II, § 3, the "right to a clean and healthful environment."

¶148 I would conclude Texaco has not established error in the award of restoration costs via its "Issue 1" arguments addressed above regarding the "general rules" and *Burk Ranches*. Thus, like the Court, I would affirm on this issue, but I would do so without adopting the "personal use" rule.

**Texaco's CECRA Arguments—Issue 2**

¶149 Unlike the Court, I would not address the merits of Texaco's CECRA arguments. In its opening brief, Texaco asserts CECRA precludes a party from bringing a "claim" for restoration costs. As Sunburst observes, however, Texaco did not plead claim

65

preemption as an affirmative defense and, therefore, has waived that defense. *See Winslow v. Montana Rail Link, Inc.*, 2005 MT 217, ¶¶ 37-38, 328 Mont. 260, ¶¶ 37-38, 121 P.3d 506, ¶¶ 37-38; M. R. Civ. P. 8(c). For that reason, I do not address Texaco's reliance on cases regarding exhaustion of administrative remedies before filing suit and courts' deference in appeals from administrative agency decisions.

¶150 Texaco adamantly asserts in its reply brief, however, that its argument is not that CECRA precludes Sunburst from bringing its claims, but that CECRA precludes the remedy of restoration costs as a form of damages. By my reading, Texaco's argument is not that a jury may never award restoration costs—as our prior cases discussed above clearly establish it sometimes may—but that neither a judge nor a jury may usurp DEQ's role in evaluating the merits of alternative remediation plans. In that respect, Texaco is challenging the *basis* for an award of restoration costs, rather than merely the jury's ability to award restoration costs as damages. Thus, I conclude Texaco's "preclusion" arguments are claim preemption arguments and, as set forth above, would not address them because they were not pled as an affirmative defense.

¶151 Texaco also argues in its reply brief, however, that regardless of its failure to plead claim preemption as an affirmative defense, Sunburst was on notice with respect to Texaco's CECRA-related arguments because Texaco asserted these arguments in certain documents filed in the District Court. Among these documents, as mentioned above, is Texaco's motion in limine to exclude evidence of alternative remediation options under the doctrine of primary jurisdiction. In its separate motion in limine to exclude evidence of alternative restoration proposals, Texaco referred the District Court to its "primary

66

jurisdiction" motion and made the "general rules" and *Burk Ranches* permanency presumption arguments discussed above in Issue 1. Texaco also lists documents that either do not mention CECRA at all, or mention CECRA only in relation to different matters, including Texaco's Article II, § 3-related argument—which I address in Issue 3. Thus, Texaco's only District Court CECRA "preclusion" argument not already addressed is its reliance on the doctrine of primary jurisdiction.

¶152 In a footnote to its reply brief here, however, Texaco states that Sunburst's discussion of the doctrine of primary jurisdiction is "off the point." This is Texaco's only mention of the doctrine. On this record and in my view, the only reasonable construction of Texaco's "off the point" remark is that Texaco has abandoned its reliance on the doctrine of primary jurisdiction—which is the only CECRA "preclusion" argument it properly preserved in the District Court. Thus, I would not further address Texaco's arguments that CECRA precluded the remedy of restoration damages in this case.

¶153 For these reasons, I conclude Texaco has not established error in the award of restoration costs. Consequently, to the extent the Court's result in Issue 2 affirms the award of restoration costs, I concur.

**Texaco's Article II, § 3 argument—Issue 3**

¶154 Regarding Issue 3, I respectfully, but strongly disagree with the Court's characterization of Texaco's Article II, § 3 argument as a challenge to the viability of Sunburst's constitutional tort claim or to any damages other than the $15 million restoration costs award. As discussed below, I believe Texaco's argument is that Article II, § 3 is not a law "compelling" restoration for purposes of awarding restoration damages

67

for trespass, as contemplated in the footnote exception to the *Burk Ranches* permanency presumption, because Article II, § 3 is, in Texaco's view, not self-executing.

¶155 Sunburst brought several tort claims, including a constitutional tort claim for violation of Article II, § 3. As set forth in Issue 1, the District Court cited to Article II, § 3 in determining that restoration costs were appropriate because the footnote exception to the *Burk Ranches* permanency presumption was satisfied here. Thus, Article II, § 3 was the basis for both the constitutional tort claim and the District Court's *Burk Ranches* analysis pertaining to restoration costs. As discussed below, however, Texaco has not raised an issue about the constitutional tort claim. Its assertion of error pertains solely to the District Court's reliance on Article II, § 3 in awarding restoration costs, which were not awarded for the constitutional tort.

¶156 Certain portions of the special verdict form are, in my view, critical to understanding and properly addressing Texaco's arguments on appeal. Question 1 stated the District Court had determined as a matter of law that Texaco trespassed on certain plaintiffs' property, and a question of fact remained about whether other plaintiffs' properties were located on the plume of contamination. The jury determined, pursuant to question 1, that some of those "question of fact" plaintiffs' properties were on the plume, and others were not. Question 1 further directed the jury to award damages for trespass by answering questions 14 through 16.

¶157 Question 2 stated the District Court had determined as a matter of law that Texaco was strictly liable for any damages caused by the release of gasoline constituents and petroleum hydrocarbons. Question 2 then asked the jury whether the release caused

damage to the plaintiffs who owned properties on the plume. The form provided no space, however, for the jury to answer the factual causation question. Question 3 stated that, if the jury's answer to question 2—the question regarding causation which provided no space for the jury to answer—was "yes," it was to award damages by answering questions 14 through 16. Under question 14, the jury awarded $15 million, as a "[s]ingle award of restoration damages for all Plaintiffs collectively," to restore the plaintiffs' properties to the condition they were in prior to the contamination. As discussed below, this is the award Texaco challenges on appeal.

¶158 Questions 4 and 5 asked the jury whether Texaco violated Sunburst's constitutional right to a clean and healthful environment and whether that violation of Sunburst's constitutional right caused damage to the plaintiffs, and the jury answered "yes" to both questions. The form provided that, since the jury answered "yes" to both questions 4 and 5, it was to award damages by answering question 18 of the special verdict form. In addition, the form instructed that, if the jury answered "yes" to a question regarding Sunburst's public nuisance claim—which it did—it was to answer question 18 of the special verdict form. Question 18 listed the plaintiffs and provided a blank space next to each plaintiff's name for the jury to write an amount of damages, if any, to be awarded to each plaintiff. In question 18, the jury awarded the listed plaintiffs amounts ranging from $1,500 to $20,000, for a total of $226,500. As set forth below, Texaco does not challenge this award.

¶159 Before discussing Texaco's arguments on appeal, I highlight three important points demonstrated by the special verdict form. First, the jury awarded $15 million in

restoration costs pursuant to question 14, which the form instructed the jury to answer only in relation to the trespass and strict liability claims. Second, because the jury did not—indeed, could not—answer the causation question with respect to the strict liability claim, a plain reading of the special verdict form establishes that the $15 million restoration costs award was for the trespass claim only. Third, the District Court entered judgment as a matter of law on Sunburst's trespass claim and elements of the strict liability claim, not any portion of the constitutional tort claim.

¶160 On appeal, Texaco consistently refers to the $15 million awarded pursuant to question 14 as "restoration damages," "remediation damages," or "restoration costs." By contrast, it refers to the damages awarded in questions 16 through 19—including the $226,500 awarded in question 18 for nuisance and constitutional tort—as "individualized damages." In its statement of issues, argument headings, and substantive arguments, Texaco directs its Article II, § 3-related arguments toward the $15 million in restoration damages—and does not challenge the $226,500 in "individualized damages" awarded for constitutional tort and nuisance. Thus, in my view, the arguments presented in Texaco's briefs clearly do not challenge the viability of the constitutional tort claim or the $226,500 awarded for the constitutional tort and public nuisance claims pursuant to question 18.

¶161 In addition, Texaco has not briefed any argument that the $15 million in restoration costs were awarded for Sunburst's constitutional tort claim. In Section V(F) of the statement of *facts* in its opening brief, Texaco observes it objected to three jury instructions setting forth a restoration measure of damages for trespass, strict liability and

70

constitutional tort—jury instructions 16, 17 and 19, respectively (the numbering of which is unrelated to the special verdict form questions discussed above).  Texaco's briefs do not, however, present argument or authorities regarding jury instruction 19 or any other jury instruction on damages relating to Sunburst's constitutional tort claim.  Rather, in its Article II, § 3-related arguments regarding restoration damages, Texaco uses the terms "directing verdicts" and "directed"—which I interpret as references to the District Court's judgments as a matter of law on the trespass claim and on elements of the strict liability claim.  In addition, Texaco cites to only those portions of the special verdict form and jury instructions relating to damages for trespass and strict liability (with one exception, which I believe must be a typographical error, because the cited jury instruction does not refer to damages at all).  Thus, Texaco's briefs posit that the challenged $15 million in restoration damages was awarded for trespass or strict liability or both, not for constitutional tort.

¶162  A plain reading of the jury's special verdict form indicates that trespass was the sole claim underlying the $15 million restoration costs award.  Texaco has not—in the District Court or here—addressed the irregularity in the special verdict form resulting in the jury's inability to answer a threshold causation question regarding strict liability.  Nor has it offered any authority that would "trump" a plain reading of the special verdict form, with respect to jury instruction 19 or otherwise.  Thus, in my view, the record mandates a conclusion that the jury awarded $15 million in restoration costs for the trespass claim only, and Texaco's briefed arguments clearly pertain only to that award.

¶163  In this respect, I note counsel made certain assertions at oral argument that I do not

believe are properly before us. We scheduled two separate oral arguments, to be held on the same day, in this case. For the morning session, we consolidated this case with two other cases and derived our statement of the "environmental issues" to be argued from one of the other cases. Those issues were: (1) whether Article II, § 3 is self-executing; (2) whether a *Bivens*-type action would lie for violation of the right to a clean and healthful environment; and (3) whether such an action could be brought against a private entity. We explained in our classification order that the three issues "encompass[ed]" those raised in all three cases. The afternoon session included only this case and was limited to the appeal and cross-appeal issues other than the "environmental issues."

¶164 At the morning session, Texaco's counsel stated a belief that no constitutional tort exists for violating Article II, § 3. It is important to note, in this respect, that Texaco did not appeal from the District Court's pretrial order denying its motion for judgment on the pleadings regarding Sunburst's constitutional tort claim. Moreover, I reiterate my view that Texaco's briefs frame the issue of whether Article II, § 3 is self-executing only in relation to the District Court's *Burk Ranches* analysis of the availability of restoration costs for trespass—addressed below. The only reference in Texaco's briefs to a *Bivens*-type action is the parenthetical phrase "Bivens action" after a citation to a federal case. That parenthetical phrase, standing alone, does not raise a *Bivens*-related issue regarding Sunburst's constitutional tort claim. Thus, I do not believe counsel's oral argument assertion regarding the viability of the constitutional tort claim is properly before us.

¶165 Also at the morning argument, Texaco's counsel asserted that if the District Court correctly determined the constitutional tort claim was viable, the issue before us is the

72

appropriate measure of damages for the constitutional tort claim. At the afternoon session, another of Texaco's attorneys asserted that a jury instruction—apparently jury instruction 19—indicated the jury awarded $15 million in restoration costs for the constitutional tort claim. Texaco simply did not brief any argument regarding the damages for constitutional tort, nor did our classification order authorize Texaco to raise these contentions for the first time at oral argument. Moreover, as discussed above, any assertion that the jury awarded restoration costs for the constitutional tort claim is belied by a plain reading of the jury's special verdict form.

¶166 I recognize some confusion may have arisen regarding what issues were "fair game" at each oral argument. In my view, however, counsel for Texaco did not properly or sufficiently raise and support any "new" assertions at that time. To the extent the Court's analysis addresses these "new" assertions relating to the constitutional tort claim or attempts to force Texaco's arguments into the "mold" of our statement of the issues in the classification order, I cannot agree.

¶167 It remains necessary, however, to address Texaco's briefed arguments regarding Article II, § 3—that the District Court erred in relying on Article II, § 3 in its *Burk Ranches* analysis and in determining, as a result, that restoration costs were to be awarded for trespass. Texaco's arguments boil down to an assertion that Article II, § 3 does not compel the damages remedy of restoration costs for trespass under the *Burk Ranches* footnote exception because Article II, § 3 is, in Texaco's view, not self-executing and the Legislature has enacted laws (namely, CECRA) to implement Article II, § 3.

¶168 Other than generally asserting Article II, § 3 does not "compel" remediation

73

damages—an apparent reference to the "laws which compel repair or replacement" language in the footnote exception to the *Burk Ranches* permanency presumption—Texaco does not address any relationship between the footnote exception and its "non-self-executing" arguments. In my opinion, Texaco cannot establish error in the restoration costs award without addressing what the *Burk Ranches* footnote exception means, and whether the District Court's interpretation of the footnote exception—in relation to the asserted non-self-executing nature of Article II, § 3 or otherwise—was correct.

¶169 I conclude Texaco has not established error in the District Court's application of Article II, § 3 in its analysis under *Burk Ranches*. Having so concluded, I would not further address Texaco's argument that Article II, § 3 is not self-executing.

¶170 For the foregoing reasons, I strenuously, but respectfully, disagree with the Court's analysis of this issue. I concur, however, insofar as the result the Court reaches is to affirm the award of restoration costs.

**Expert Testimony Sanction—Issue 4**

¶171 It appears that the Court has experienced a form of "issue drift," insofar as it properly states Issue 4 as one concerning a remedy for violating the scheduling order and M. R. Civ. P. 26(b)(4)(A)(i) in ¶ 6, but addresses the District Court's exclusion of expert testimony in ¶¶ 68 and 73 as a ruling on the admissibility of evidence, such as that at issue in *Vernes*. Moreover, the Court proceeds directly from its discussion in ¶ 70 of the comparability of a scheduling order and an interrogatory—a matter I do not believe Texaco seriously disputes—to an analysis of whether Sunburst was prejudiced by the

74

allegedly inadequate disclosures. In my view, the prejudice to Sunburst, or lack thereof, comes into play only if the Court first concludes the District Court did not abuse its discretion in determining that Texaco's conduct warranted sanctions—or, in other words, that Texaco actually violated the scheduling order or M. R. Civ. P. 26(b)(4)(A)(i). For these reasons, I cannot join the Court's analysis of Issue 4.

¶172 Some background leading to the District Court's rulings on this issue helps set the stage for what I believe is the appropriate analysis. This case commenced in the District Court in February of 2001. Texaco removed the case to the United States District Court for the District of Montana, which remanded it in January of 2002. The District Court entered a scheduling order on November 8, 2002. Later, upon the parties' stipulation, the District Court vacated that scheduling order. The District Court entered a second scheduling order on October 21, 2003, which required, among other things, disclosure of experts by March 26, 2004.

¶173 On March 29, 2004, the parties filed a stipulation to resolve a discovery dispute. Among other things, the stipulation provided that the expert disclosure deadline would be extended to May 11, 2004, only two and one-half months before the date set for trial. Sunburst timely filed its disclosure on that date. On May 13, 2004, Texaco filed a document entitled "Texaco's Rule 26(b)(4)(A)(i) Disclosures." That document lists 191 individuals, without clearly differentiating all expert witnesses from fact witnesses. It appears from the record that approximately 67 of these witnesses may have been expected to offer expert testimony.

¶174 On May 17, 2004, Sunburst moved to exclude Texaco's expert witnesses pursuant

to M. R. Civ. P. 16, 26 and 37. Texaco responded on June 4, 2004, and Sunburst replied on June 14. Texaco did not, at any point, attempt to supplement its disclosures, although it did move to amend its disclosures to add a previously unidentified expert. The District Court heard arguments on Sunburst's sanction motion to exclude Texaco's experts on July 26, 2004. Jury voir dire commenced on July 27.

¶175 At the July 26 hearing, Texaco conceded it had left certain "blanks" in the disclosures regarding some witnesses, and would not offer expert testimony from those individuals. Regarding other disclosures, Texaco asserted that references to DEQ reports in Sunburst's possession set forth the witnesses' opinions and grounds for those opinions. The District Court stated "[w]ell, you mean just to make reference to four file drawers of research that they've done? That's not really good enough." Analogizing Texaco's report-referencing disclosures to requests for *in camera* inspection of voluminous documents, the court stated "those are non[-]disclosures because the devil is in the detail. I'm being inundated. And that's the problem. That's the reason why I think you have to have specific disclosure, the opinion itself and the grounds or the methodology used to arrive at that opinion." The court also stated its view that the purpose of requiring simultaneous disclosure of experts was to preclude one party from "springboard[ing]" its experts' opinions off those of the opposing party's experts. In addition, the court stated that if purported experts were "listed but there is absolutely no opinion, no grounds for an opinion, no methodology, they're not going to testify."

¶176 At trial, disputes arose regarding Texaco's disclosure of individual witnesses. During Linda Barnes' testimony in Texaco's case-in-chief, Sunburst objected to certain

76

statements and questions on grounds of hearsay and inadequate disclosure of some documents. At a sidebar, the District Court inquired about Texaco's disclosure of Barnes and ultimately ruled that she had not been adequately disclosed as an expert. In that regard, the District Court stated "I have in front of me 28 large loose leaf binders . . . . To say that the opinion is contained in those binders in my opinion is not adequate. That there is surprise. You could reach into those volumes and pull out anything." The next day, Sunburst objected to a question based on the District Court's ruling that Barnes had not been adequately disclosed as an expert, and Texaco's counsel requested another sidebar. During that sidebar, Texaco's counsel stated "I finally decided to get into the books a bit on this [Rule] 26(b)(4) issue," and asserted—based on cases from other jurisdictions—that a party need not provide expert disclosures with respect to non-retained witnesses with expertise who have perceived or participated in the events about which they testify. The District Court did not reverse its ruling regarding Barnes, and it subsequently excluded Texaco's proffered expert testimony from two other witnesses. Texaco submitted written offers of proof regarding those three witnesses, and also regarding three other witnesses who were DEQ employees excluded for reasons discussed in Issues 5 and 6.

¶177 We review a district court's decision to impose sanctions for failure to comply with a M. R. Civ. P. 16 scheduling order for abuse of discretion, because the district court sits in the best position to evaluate whether one party has disregarded the rights of the opposing party and what, if any, sanction most appropriately addresses the violating party's conduct. *Germann v. Stephens*, 2006 MT 130, ¶ 23, 332 Mont. 303, ¶ 23, 137

P.3d 545, ¶ 23 (citations omitted).

¶178 The pertinent part of the scheduling order at issue states:

> March 26, 2004 [subsequently extended by stipulation to May 11]: The parties must disclose names and addresses of witnesses, including expert witnesses on or before this date. The expert witness disclosure shall include information required by Rule 26(b)(4)(A)(i), M.R.Civ.P. The purpose of this order is to achieve simultaneous disclosure of expert witnesses. No expert may be identified after this date except upon a showing of good cause.

M. R. Civ. P. 26(b)(4)(A)(i) states:

> (4) Trial preparation: Experts. Discovery of facts known and opinions held by experts, otherwise discoverable under the provisions of subdivision (b)(1) of this rule and acquired or developed in anticipation of litigation or for trial, may be obtained only as follows:
>     (A)(i) A party may through interrogatories require any other party to identify each person whom the other party expects to call as an expert witness at trial, to state the subject matter on which the expert is expected to testify, and to state the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion.

¶179 Texaco makes no argument and sets forth no case law regarding M. R. Civ. P. 16, with respect to whether its conduct met the requirements of the scheduling order. It mentions the scheduling order only to the extent that order references M. R. Civ. P. 26(b)(4)(A)(i). Texaco then immediately proceeds to a discussion of whether its disclosures comported with Rule 26(b)(4)(A)(i).

¶180 As stated above, the appellant bears the burden of establishing error. *Marriage of McMahon*, ¶ 7. Given Texaco's total failure to address whether it complied with the non-Rule 26(b)(4)(A)(i)-related parts of the scheduling order, I would simply conclude that it has not established an abuse of discretion in the District Court's decision that a sanction was appropriate. I have also carefully considered Texaco's arguments and authorities

78

regarding M. R. Civ. P. 26(b)(4)(A)(i) and, if it were necessary to reach them, I would conclude that Texaco has not, via those arguments and authorities, established an abuse of discretion in the District Court's decision to impose a sanction on this record.

¶181 Texaco next asserts that the District Court was required to afford it a second chance—a step the court did not take—before imposing any sanction. In addition, Texaco contends telephone calls between counsel could have resolved this dispute. These arguments—in the context of this case and the record before us—are, in my view, specious.

¶182 In any event, Texaco's reliance on *Burlington Northern v. District Court*, 239 Mont. 207, 779 P.2d 885 (1989), is misplaced. Texaco states that our intent regarding discovery sanctions, as stated in *Burlington Northern*, is that a party whose conduct may warrant sanctions gets "a second chance to comply with discovery requests before awarding sanctions." *See Burlington Northern*, 239 Mont. at 218, 779 P.2d at 893. Texaco's reading is far too broad.

¶183 What Texaco fails to acknowledge is our observation of the importance of distinguishing between the subsections of Rule 37, the rule setting forth discovery sanctions. As is clear in *Burlington Northern*, Rule 37(a) provides for a sanction of attorney fees and costs in certain specific circumstances. *Burlington Northern*, 239 Mont. at 218, 779 P.2d at 892-93. That subsection of M. R. Civ. P. 37 is not at issue here.

¶184 Texaco's reliance on *Burlington Northern* for the necessity of a "second chance," insofar as it relates to Rule 37(b), is correct as far as it goes. We stated without

79

equivocation that "[u]nder section (b) no sanctions are available without a previous court order[.]" *Burlington Northern*, 239 Mont. at 219, 779 P.2d at 893. Here, however, the scheduling order is indisputably a court order, as contemplated in M. R. Civ. P. 37(b), and M. R. Civ. P. 16(f) clearly provides that a court may impose certain sanctions set forth in M. R. Civ. P. 37(b), including prohibiting the introduction of certain evidence, for violation of a scheduling order. Thus, Rule 37(b) applies in this case.

¶185 The other portion of Rule 37 addressed in *Burlington Northern* is the sanction available pursuant to M. R. Civ. P. 37(d) which may be imposed, without a "second chance," for failure to attend one's own deposition, serve answers to interrogatories, or respond to a request for inspection. *See Burlington Northern*, 239 Mont. at 218-19, 779 P.2d at 893. Because in this case, as stated by the Court in ¶ 70, the scheduling order is the functional equivalent of an interrogatory, Texaco's violation of that order was also sanctionable without a "second chance" under M. R. Civ. P. 37(d). I conclude the District Court did not abuse its discretion in excluding Texaco's experts without first affording a "second chance."

¶186 Finally, Texaco contends that, in the event we affirm the District Court's decision to impose a sanction, the exclusion of its expert witnesses was too harsh under the three-factor test for analyzing the harshness of discovery sanctions articulated in *Henricksen v. State*, 2004 MT 20, ¶ 58, 319 Mont. 307, ¶ 58, 84 P.3d 38, ¶ 58. Texaco cites to no authority for the proposition that this three-factor test applies to scheduling order sanctions as well as to discovery sanctions. However, because I agree with the Court's reasoning in ¶ 70 that the scheduling order had the same effect as an interrogatory, I

address Texaco's "harshness" arguments under the three-factor discovery sanction test.

¶187 After briefing in this case ended, we decided *Culbertson-Froid-Bainville Health Care Corp. v. JP Stevens & Co.*, 2005 MT 254, 329 Mont. 38, 122 P.3d 431. There, we reiterated our longstanding three-factor test for discovery sanctions as whether the sanction (1) relates to the extent and nature of the discovery abuse; (2) relates to the extent of the prejudice to the opposing party which resulted from the discovery abuse; and (3) is consistent with the consequences expressly warned of by the trial court, if such a warning was actually issued. *Culbertson*, ¶ 14 (citation omitted). We also clarified that the third prong of the "harshness" test does not require a trial court to issue a warning before imposing a discovery sanction. *Culbertson*, ¶ 15. In this respect, Texaco's assertions regarding the District Court's failure to issue a warning are without merit, because the District Court was not required to do so.

¶188 Regarding the other two factors, Texaco contends the exclusion of its experts is not proportional to the violation, because the District Court could have limited its expert testimony to the opinions expressed in a feasibility study and subsurface report filed with DEQ, and Texaco's violation was neither a complete failure to disclose nor a contumacious action. Texaco further asserts Sunburst was not prejudiced because Sunburst deposed three experts and had opportunity to depose others, Sunburst's experts referred to opinions set forth in the DEQ reports and did not assert difficulty in identifying those opinions, Sunburst did not complain of prejudice until the District Court suggested it, and Sunburst's expert reports were longer than the DEQ reports.

¶189 In this respect, while I do not necessarily agree with the Court's reliance in ¶ 72 on

*Jenkins*—a case from another jurisdiction advanced by Texaco for a different proposition—I agree that Texaco's arguments on appeal do not establish an abuse of discretion in the exclusion of its experts' testimony based on the "harshness of discovery sanctions" test. Given the stipulated, later date for meeting the scheduling order requirements, the untimely and far from adequate disclosure by Texaco, the hearing on Sunburst's motion only the day before trial, and Texaco's counsel's rather off-hand statement in the midst of trial that he had "finally decided to get into the books a bit" on the discovery sanction issue, I would conclude Texaco has not established by its arguments that the sanction was too harsh under the circumstances of this case. For these reasons, I would decline to address the Montana cases and cases from other jurisdictions advanced by Texaco regarding overly harsh sanctions which generally concern a single violation in a simpler case involving far less delay and far fewer identified or potential experts than those involved here.

¶190 I conclude the District Court did not abuse its discretion by excluding Texaco's expert testimony as a sanction.

**DEQ Evidentiary Ruling in relation to substantive tort claims—Issue 5**

¶191 Regarding Issue 5, while I agree with the result the Court reaches, I must respectfully dissent from its after-the-fact reasoning relating to the strict liability claim because the jury could not and did not answer a necessary causation question regarding strict liability on the special verdict form. The District Court having properly left the causation question to the jury, and the special verdict form having prevented the jury from answering it, Sunburst did not prevail on—or recover damages for—the strict

82

liability claim. In addition, the Court's after-the-fact analysis contradicts Sunburst's theories of the case at trial, including arguments regarding Texaco's alleged failure to respond appropriately in the years immediately preceding the trial and—as noted by the Court in ¶ 67—assertions that the plume was expanding at the time of trial, which Sunburst posited was due in part to sources at the refinery site other than the 1955 leak. The Court's after-the-fact analysis also is contrary to the District Court's reasoning in its order on the parties' statute of limitations motions that the torts in this case were continuing. For these reasons, I cannot join the Court's analysis.

¶192 Before turning to the record, I note Texaco frames its arguments regarding this issue in terms of the "trial on methods of remediation" and "the jury's assessment of remedial measures"—indicating yet again its focus on the $15 million award for trespass and not any "individualized damages" awarded for the substantive torts, including the constitutional tort. In any event, Texaco makes no argument in this issue differentiating the constitutional tort claim from the other substantive tort claims. Below, my references to "substantive tort claims" do not include the constitutional tort claim, about which Texaco has made no specific argument.

¶193 Sunburst's second motion in limine sought to prohibit Texaco from introducing evidence of or referring to the DEQ proposal or selection of a remediation method on grounds the evidence was irrelevant to the substantive tort claims for which it sought restoration costs, and would be prejudicial and confusing. In response, Texaco asserted the DEQ decisions were highly relevant because, among other things, its actions and the appropriate remediation method could not be understood except in the context of DEQ's

83

administrative oversight.

¶194 Addressing Sunburst's motion at the pretrial hearing, the parties and the District Court discussed several matters, including whether the court or jury would be required to defer to DEQ's decisions, whether Texaco had any duties relating to the substantive tort claims that were separate from DEQ's requirements, and whether Texaco could introduce scientific evidence without mentioning DEQ. The District Court suggested that Texaco might attempt to "cloak" itself in the authority of DEQ, "[o]r taking it in a different direction, saying we're blameless. We're just doing what DEQ told us to do." The court opined, in the latter regard, that "[i]t almost approaches the empty chair defense."

¶195 Just before opening statements, the District Court orally granted Sunburst's motion in limine, thereby prohibiting Texaco from introducing any evidence of DEQ's involvement. After further argument, however, the court stated it was making "general statements" and had not heard the testimony. The court indicated it would allow Texaco to present evidence of the steps Texaco took, but not to say "we are just acting at the direction of DEQ." After yet more argument, the District Court advised that if Texaco believed any evidence was "absolutely critical" at any point during the trial, the court would hear argument outside the presence of the jury.

¶196 Throughout the trial, the District Court held frequent sidebars to address Texaco's assertions that, in examining various witnesses, Sunburst opened the door to certain testimony regarding DEQ's involvement. The court repeatedly ruled that, while DEQ was not at issue in this case, Texaco could inquire regarding why certain actions were taken and could cross-examine about matters raised during Sunburst's examination.

Texaco attempted to do so, but the expert sanction discussed in Issue 4 often prevented Texaco from presenting expert testimony, and Texaco asserted difficulty in presenting other testimony regarding its conduct without referring to DEQ.

¶197 The District Court subsequently entered its written order, which stated "MDEQ's opinion as to proper remediation under CECRA does not address the extent of [the] damages claimed by the Plaintiffs[,]" and evidence of DEQ's CECRA-related determinations and opinions would unnecessarily lengthen the trial and cause confusion. Regarding Texaco's argument that DEQ's opinions about remediation methods would guide the jury in determining the amount of restoration damages, the District Court also reasoned that Texaco had not properly disclosed any DEQ witness as an expert. In its later order denying Texaco's motions for a new trial and for judgment as a matter of law, the District Court restated its reasoning that the DEQ evidence was irrelevant and confusing, Texaco had improperly sought to "cloak" itself in the authority of the State, and much of Texaco's proffered DEQ evidence was inadequately disclosed expert evidence. On appeal, Texaco challenges this evidentiary ruling—under this issue—as it pertains to the substantive tort claims.

¶198 We review a trial court's evidentiary ruling for abuse of discretion. *Finstad*, ¶ 43. A court abuses its discretion when it acts arbitrarily without employment of conscientious judgment or exceeds the bounds of reason. *Murray v. Talmage*, 2006 MT 340, ¶ 10, 335 Mont. 155, ¶ 10, 151 P.3d 49, ¶ 10 (citation omitted).

¶199 Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less

85

probable than it would be without the evidence. M. R. Evid. 401. Evidence which is not relevant is not admissible. M. R. Evid. 402.

¶200 With respect to the District Court's relevancy reasoning, Texaco contends the District Court abused its discretion in excluding the DEQ evidence as it pertained to the substantive tort claims, because the jury did not have "context" in which to place evidence regarding standards for contamination and risks resulting from violations of those standards. In this respect, Texaco asserts the District Court forced the jury to assume DEQ's role in selecting remediation standards and remedies, yet denied the jury information that would have been most important to DEQ or to a court reviewing DEQ's decisions. Texaco also asserts that the excluded evidence would have established that DEQ directed each step in the investigation and monitored the work of Texaco's environmental contractors. Moreover, Texaco contends the District Court's ruling precluded it from presenting evidence that DEQ would do the monitoring under the MNA plan. On their face, these arguments have little to do with Sunburst's substantive tort claims.

¶201 In addition, Texaco presents only scant—and general—authority regarding the District Court's relevancy reasoning as it pertains to the substantive tort claims. It advances *Schuff v. A.T. Klemens & Son*, 2000 MT 357, ¶¶ 27, 81, 303 Mont. 274, ¶¶ 27, 81, 16 P.3d 1002, ¶¶ 27, 81, a case addressing a discovery sanction in which we reviewed whether the trial court, in view of all the circumstances, ignored recognized principles, including the principle of trial on the merits, resulting in substantial injustice. It also advances *Montana Fair Housing, Inc. v. Barnes*, 2002 MT 353, ¶ 12, 313 Mont. 409, ¶

86

12, 61 P.3d 170, ¶ 12, in which we stated that a ruling based on an inaccurate view of the law or clear error of fact—there, the denial of attorney's fees—is an abuse of discretion. Texaco advances no other authority regarding relevancy under this issue. In my view, these few and readily distinguishable cases provide no assistance to Texaco in meeting its burden of establishing an abuse of discretion with respect to the District Court's evidentiary ruling based on relevancy considerations.

¶202 In any event, I am unwilling to conclude that evidence is relevant simply because the offering party has characterized it as providing "context." Nor do I believe Texaco has established that regulatory compliance evidence regarding CECRA standards and DEQ's involvement would make more or less probable any fact of consequence pertaining to Sunburst's substantive tort claims.

¶203 I conclude Texaco has failed to establish that the District Court abused its discretion by excluding the DEQ evidence as irrelevant to Sunburst's substantive tort claims. As a result, it is unnecessary to address the other bases on which the District Court excluded that evidence, and Texaco's related arguments, in this issue.

**Punitive Damages—Issue 6**

¶204 I concur in the Court's conclusion that the District Court abused its discretion by excluding Texaco's DEQ-related evidence at trial for the jury's consideration in relation to the question of Texaco's liability for punitive damages and join the Court in reversing and remanding on that basis. As discussed more thoroughly below, however, it is my view that this conclusion can—and should—be reached under Montana law, as opposed to the cases from other jurisdictions upon which the Court relies.

87

¶205 In ¶ 81, the Court advances *Silkwood* for the proposition that a good-faith effort to comply with government regulations "would be" evidence of conduct inconsistent with the mental state requisite for punitive damages. The *Silkwood* case, as cited, was a federal district court's post-trial order and opinion, an order and opinion that ultimately led to a series of appellate decisions. *See Silkwood v. Kerr-McGee Corp.*, 667 F.2d 908 (10th Cir. 1981); *Silkwood v. Kerr-McGee, Corp.*, 464 U.S. 238, 104 S.Ct. 615 (1984) (superseded by statute); *Silkwood v. Kerr-McGee, Corp.*, 769 F.2d 1451 (10th Cir. 1985). The federal district court made the "good-faith" statement in rejecting the defendant's argument that it was entitled to a jury instruction that a defendant's substantial compliance with atomic energy regulations barred punitive damages. *Silkwood*, 485 F. Supp., at 577-85. The court reasoned that the defendant had ample opportunity to present evidence of its compliance—apparently, absent any objection by the plaintiff—and the jury determined its conduct warranted punitive damages based on the evidence presented at trial. *Silkwood*, 485 F. Supp. at 584. Here, of course, the very issue before us is whether the District Court abused its discretion in excluding DEQ-related evidence from the jury's consideration of Texaco's liability for punitive damages. In my view, *Silkwood* provides little assistance on that issue.

¶206 Nor would I rely on *EEOC* or *Swinton*, which are both federal employment discrimination cases. Among other things, those cases provide that (1) to be liable for punitive damages, an employer must not only discriminate, but know the discrimination may violate federal law; and (2) an employer may assert "good faith" as a defense to allegations of vicarious liability for managers' discriminatory actions. *See Swinton*, 270

88

F.3d at 809-10 (citing *Kolstad v. American Dental Ass'n*, 527 U.S. 526, 536, 545, 119 S.Ct. 2118, 2125, 2129).  Those legal considerations are not at issue here and, as a result, I would not rely on such unrelated cases.  Moreover, I observe that, contrary to the Court's citation to *Swinton* in ¶ 84 for the proposition that a court "may not categorically exclude" evidence regarding a defendant's reasons for acting or not acting, the Ninth Circuit actually "decline[d] to endorse" a bright-line rule that post-occurrence remedial evidence is either always relevant or always irrelevant, and characterized the admissibility of such evidence as within a trial court's discretion.  *Swinton*, 270 F.3d at 814-17.  *Swinton* has no application here.

¶207  As stated above, relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.  *See* M. R. Evid. 401.  In past cases, this Court has often set forth the language of M. R. Evid. 401 and—without advancing any authority regarding the relevancy of a specific category of evidence—concluded that the evidence at issue either was or was not relevant.  *See, e.g.*, *State v. Cesnik*, 2005 MT 257, ¶ 16, 329 Mont. 63, ¶ 16, 122 P.3d 456, ¶ 16; *Wiman v. Dept. of Labor and Industry*, 2004 MT 208, ¶¶ 32-33, 322 Mont. 332, ¶¶ 32-33, 96 P.3d 710, ¶¶ 32-33; *Christofferson v. City of Great Falls*, 2003 MT 189, ¶ 34, 316 Mont. 469, ¶ 34, 74 P.3d 1021, ¶ 34.  These cases illustrate that relevancy generally is a fact- and record-specific question that requires a court to consider—under the circumstances of a given case—whether a fact is "of consequence," and whether the evidence tends to make the existence of that fact more or less probable.  While cases concerning similar types of

89

evidence may be helpful in our analysis of relevancy, especially when we have the benefit of parties' arguments on whether the cases are analogous or distinguishable, our prior cases are clear that such authorities are not always necessary.

¶208 Before addressing the District Court's evidentiary ruling, I note Texaco's assertion of entitlement, based on regulatory compliance, to judgment as a matter of law with respect to the punitive damages claim. Texaco's position is primarily based on United States Supreme Court cases addressing the federal Due Process Clause in relation to awards based on nationwide or out-of-state conduct affecting non-parties, and appellate decisions—including one Montana case—in which reviewing courts have determined a punitive damages jury instruction was not warranted based on a record including evidence of a defendant's regulatory compliance. *See, e.g.*, *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 420-21, 123 S.Ct. 1513, 1521-22 (2003); *Ferguson v. Town Pump, Inc.*, 177 Mont. 122, 132-33, 580 P.2d 915, 921 (1978), *overruled on other grounds by Bohrer v. Clark*, 180 Mont. 233, 240, 590 P.2d 117, 121 (1978); *Harrison v. Indiana Auto Shredders Co.*, 528 F.2d 1107, 1125-26 (7th Cir. 1976). These cases are not persuasive.

¶209 In a reply brief footnote, Texaco provides only a citation and parenthetical summary of *Alcorn v. Union Pacific R.R. Co.*, 50 S.W.3d 226, 247-49 (Mo. 2001), which apparently applies an automatic preclusion of punitive damages based on a defendant's regulatory compliance—although that case also has language regarding "factors" to be considered in determining whether punitive damages are precluded as a matter of law. Without more extensive argument, I am unconvinced that Montana should or would

follow *Alcorn*'s reasoning. Thus, I conclude Texaco has not established error in the District Court's failure to enter judgment as a matter of law in its favor regarding the punitive damages claim.

¶210 Turning now to the District Court's evidentiary ruling as it pertains to punitive damages, the District Court reasoned that the DEQ evidence was not admissible because it was irrelevant, confusing, and a "cloak," or a means for Texaco to posit "we did it at the direction of DEQ." The District Court also determined that much of the DEQ evidence was expert testimony that had been excluded as a sanction for inadequate disclosure. I address these reasons in turn, relying on Montana law.

¶211 Again, as stated above, M. R. Evid. 401 defines relevant evidence as evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Our cases further provide that evidence is relevant if it will have any value, as determined by logic and experience, in proving the proposition for which it was offered. *See State v. Hamilton*, 2002 MT 263, ¶ 20, 312 Mont. 249, ¶ 20, 59 P.3d 387, ¶ 20 (citation omitted); *Werre v. David*, 275 Mont. 376, 389, 913 P.2d 625 633 (1996) (citation omitted).

¶212 Subject to certain statutory provisions, reasonable punitive damages may be awarded when the defendant has been found guilty of actual fraud or actual malice. Section 27-1-221(1), MCA. A defendant is guilty of actual malice if the defendant has knowledge of facts or intentionally disregards facts that create a high probability of injury to the plaintiff, and deliberately proceeds to act in conscious or intentional disregard of,

91

or with indifference to, the high probability of injury to the plaintiff. Section 27-1-221(2), MCA. A defendant is guilty of actual fraud if the defendant makes a representation with knowledge of its falsity, or conceals a material fact with the purpose of depriving the plaintiff of property or legal rights or otherwise causing injury. Section 27-1-221(3), MCA.

¶213 The District Court instructed the jury in accordance with §§ 27-1-221(2) and (3), MCA, with regard to definitions of fraud and malice for purposes of punitive damages, including language about a defendant acting intentionally, knowingly or purposefully in causing damage to the plaintiff. On the special verdict form, the jury answered "yes" to question 13, which reads "[w]ere the Defendants guilty of actual malice and/or actual fraud, as defined by the Court's instructions, with respect to their conduct in Sunburst so as to impose punitive damages?"

¶214 Since Texaco was not permitted to introduce the DEQ evidence in relation to its liability for punitive damages, the issue is whether that evidence meets the standard in M. R. Evid. 401 of "having any tendency to make the existence of any fact . . . of consequence"—here, Texaco's state of mind—"more probable or less probable." In my view, the only reasonable answer is that the DEQ evidence was, indeed, very relevant. Based on the DEQ evidence, a jury could have determined that Texaco did not act intentionally, knowingly, or purposefully in causing injury to Sunburst, because it acted with the belief that its compliance with DEQ was sufficient. *See* §§ 27-1-221(2) and (3), MCA. Conversely, of course, Texaco would not necessarily have prevailed based on this evidence. Despite its lack of probative value in relation to the substantive tort claims, the

92

DEQ evidence clearly had probative value with respect to the questions of liability for actual fraud and actual malice. *See Hamilton*, ¶ 20. Thus, I conclude the District Court abused its discretion in excluding the DEQ evidence on relevancy grounds.

¶215 Regarding the District Court's reasoning that the DEQ evidence was confusing, M. R. Evid. 403 states that, although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. Texaco advances *Phillip R. Morrow v. FBS Ins.*, 236 Mont. 394, 400, 770 P.2d 859, 862 (1989), for the proposition that a trial court may exclude evidence as confusing under M. R. Evid. 403 only if "'the evidential material was necessarily and thoroughly objectionable or else was of minor utility and could be easily sacrificed . . . nor should the exclusion be an absolute one, unless a conditional or temporary exclusion would not suffice for the purpose.'" Applying *Phillip R. Morrow*, it is my view that the DEQ evidence was not of minor utility when Texaco's state of mind was the only issue relating to its liability for punitive damages. Nor am I persuaded that the evidence was necessarily and thoroughly objectionable, such that the parties or the District Court could not have devised any means of admitting the evidence solely for one purpose without confusing the jury. I conclude the District Court abused its discretion in excluding all DEQ evidence on grounds that it was confusing.

¶216 The District Court also determined, as set forth above, that the DEQ evidence would allow Texaco to "cloak" itself in the authority of DEQ, or assert "we're blameless. We're just doing what DEQ told us to do." Having concluded in Issue 5 that the DEQ

evidence was irrelevant to the substantive tort claims, I agree with the District Court's statement that Texaco could not seek to avoid liability, or don a "cloak," for *those claims* based on evidence of its compliance with DEQ. As set forth above, however, the DEQ evidence was relevant to the question of Texaco's liability for punitive damages with respect to whether it acted with actual malice or actual fraud. It is axiomatic that a defendant may assert—indeed, must be allowed to present—a defense based on relevant and otherwise admissible evidence. Thus, I conclude the District Court abused its discretion in excluding the DEQ evidence as it pertained to punitive damages liability upon reasoning that such evidence was a "cloak," or an improper attempt to shift blame.

¶217 Regarding the District Court's reasoning that "much" of the DEQ evidence was inadequately disclosed expert evidence excluded under the sanction, Texaco asserts that even if "much" of its proffered DEQ evidence was expert evidence, at least some of it was not. I agree that, at the very least, Texaco should have been allowed to present fact testimony that DEQ was supervising Texaco's activities. In my view, non-expert DEQ evidence is relevant and otherwise admissible with respect to the issue of whether Texaco acted with actual fraud or malice. Thus, I conclude the District Court abused its discretion via its blanket exclusion of all DEQ evidence based on its determination that "much" of that evidence was excluded expert evidence. As for the rest, only the parties and the District Court can sort these matters out on remand.

¶218 Having concluded, like the Court, that the District Court abused its discretion in excluding all of the DEQ evidence as it pertained to Texaco's liability for punitive damages and that a remand is necessary, several other arguments raised by Texaco need

94

not be addressed. Notwithstanding, I believe one final legal question related to punitive damages requires resolution prior to remand.

¶219 Texaco contends the District Court erred in failing to apply a 2003 statutory cap on punitive damages to reduce the $25 million award in this case because, while Sunburst filed suit in 2001, the jury rendered its verdict in 2004. Since 2003, § 27-1-220(3), MCA, has provided that a punitive damages award may not exceed $10 million or 3% of the defendant's net worth, whichever is less. Texaco asserts that, pursuant to the statute, punitive damages in this case cannot exceed $10 million.

¶220 The District Court concluded that § 27-1-220(3), MCA, enacted in 2003, did not apply retroactively to this case. Relying on *Dvorak v. Huntley Project Irr. Dist.*, 196 Mont. 167, 639 P.2d 62 (1981), the District Court determined that the statutory limit on punitive damages affected a substantive right and, therefore, § 27-1-220(3), MCA, could not be applied retroactively absent express legislative intent.

¶221 After briefing in this case, we decided *Seltzer v. Morton*, 2007 MT 62, 336 Mont. 225, 154 P.3d 561. There, we cited to *Dvorak* in concluding that § 27-1-220(3), MCA, did not apply to a cause of action that accrued before the statute's effective date of October 1, 2003. *Seltzer*, ¶¶ 121-26.

¶222 *Seltzer* and *Dvorak* control here. I conclude the District Court did not err in failing to apply the $10 million cap set forth in § 27-1-220(3), MCA.

¶223 I concur with the Court's reversal of the punitive damages award on the basis that the District Court abused its discretion in excluding the DEQ evidence as it pertained to Texaco's liability for punitive damages, and in the Court's remand.

95

**Issue 7—Attorney fees**

¶224 Regarding attorney fees, I again join the result the Court reaches, but would employ a different analysis. First, I would address Texaco's threshold argument that Sunburst's motion for attorney fees was deemed denied because the District Court lacked jurisdiction when it entered its attorney fee order four days after the 60-day time limit set forth in M. R. Civ. P. 59(g). *See Associated Press v. Crofts*, 2004 MT 120, ¶¶ 35-37, 321 Mont. 193, ¶¶ 35-37, 89 P.3d 971, ¶¶ 35-37.

¶225 A motion for attorney fees filed after entry of judgment is treated as a motion to alter or amend a judgment. *Associated Press*, ¶ 36 (citation omitted). A motion to alter or amend the judgment shall be served not later than 10 days after the service of the notice of the entry of the judgment; if the trial court does not rule on the motion within 60 days from the time the motion is filed, the motion is deemed denied. M. R. Civ. P. 59(g). The 60-day limit is a mandatory jurisdictional time limitation to which this Court strictly adheres. *Associated Press*, ¶ 37 (citation omitted).

¶226 Sunburst moved for attorney fees on August 25, 2004. Sixty days after that was October 24, which fell on a Sunday, so the District Court had until October 25 to enter its order. *See* M. R. Civ. P. 59(g). The District Court entered its order awarding attorney fees on October 29, 2004. Thus, pursuant to M. R. Civ. P. 59(g) and *Associated Press*, the District Court lacked jurisdiction to enter the order at that point, and Sunburst's motion for attorney fees was deemed denied.

¶227 Sunburst's only assertion regarding the District Court's jurisdiction is that Texaco's argument is "largely moot" because the substantive attorney fees issue has been

presented to the Court. I am unwilling to conclude a jurisdictional issue is moot absent authority to that effect. Moreover, the issue is not moot because whether Sunburst's motion was granted or deemed denied determines which party carries the burden of establishing an abuse of discretion on appeal. If deemed denied, Sunburst must establish an abuse of discretion; if granted, Texaco bears the burden.

¶228 Having concluded the District Court lacked jurisdiction when it entered the order granting attorney fees, the question remains whether Sunburst has established an abuse of discretion in the deemed denial of its motion for attorney fees under the private attorney general doctrine. In ¶ 91, the Court apparently determines, pursuant to *Flannery*—a case not cited by either party—that the size of the judgment, standing alone, entirely disposes of the question. *Flannery* addressed a California statute regarding the private attorney general doctrine that differs in certain respects from our *MonTrust* three-factor test. *See Flannery*, 61 Cal. App. 4th at 634, 71 Cal. Rptr. 2d at 635.

¶229 It is my view that Montana law, particularly *MonTrust*'s three-factor test, provides ample authority regarding the private attorney general doctrine, an equitable exception to the American Rule. As noted by the Court in ¶ 89, the *MonTrust* "private attorney general" factors are: (1) the strength or societal importance of the public policy vindicated by the litigation; (2) the necessity for private enforcement and the magnitude of the resultant burden on the plaintiff; and (3) the number of people standing to benefit from the litigation. *MonTrust*, ¶ 66.

¶230 With respect to the first two factors, Sunburst asserts it has vindicated the right to a clean and healthful environment, it was necessary to bring this private litigation because

97

DEQ was not doing enough to clean the properties, and Sunburst's counsel logged thousands of hours working on this case. Regarding the third factor, Sunburst asserts its litigation has benefited all present and future Sunburst residents, as well as all Montana citizens interested in a clean environment. In this respect, Sunburst cites to *MonTrust*, ¶ 67, in which the Court determined the litigation at issue there benefited a "large class" defined as "all Montana citizens interested in Montana's public schools."

¶231 Under either the Court's analysis or mine in Issue 3—neither of which addresses whether Article II, § 3 is self-executing or otherwise may be the basis of an independent cause of action—Sunburst's litigation has not "vindicated" a constitutional right in any manner that would benefit future litigants. Moreover, the private attorney general doctrine is primarily used when the government fails to properly enforce interests significant to its citizens. *Finke*, ¶ 31 (citation omitted). Given Sunburst's repeated assertions that DEQ is not at issue here and the corollary reality that Sunburst has not established such a governmental failure, Sunburst's "necessity" argument vis-à-vis DEQ's "not doing enough" rings somewhat hollow. Similarly, that Sunburst's counsel no doubt spent considerable time on the case is not surprising, but also does not—given various fee arrangements—necessarily result in a significant burden on the plaintiffs here. With respect to the third *MonTrust* factor—regarding the number of people standing to benefit—the record reflects that several Sunburst residents declined to join or "dropped out" of this lawsuit. Finally, insofar as Sunburst's assertions regarding "interested" Montana citizens pertains to the physical cleanup of Sunburst properties—as opposed to a "vindicated right" not established here—I interpret the third *MonTrust* factor to require

more than an assertion that the litigation benefits those Montanans interested in a clean and healthful environment. While those Montanans may have a passing concern regarding a community where they do not reside or have any other established interest, such a concern is, in my view, a far cry from the self-evident interest in Montana public schools identified in *MonTrust*.

¶232 I conclude Sunburst has not established an abuse of discretion in the deemed denial of its motion for attorney fees. Thus, I concur with the Court in its conclusion in Issue 7 that Sunburst is not entitled to attorney fees.

¶233 In sum, I concur with the results reached by the Court on all issues, for the reasons set forth above, with the caveat that I concur with the results of Issues 2 and 3 only insofar as they result in affirming the restoration costs award.

/S/ KARLA M. GRAY